Jeffrey D. STECKMAN, and all
others similarly situated,
Plaintiff–Appellant,

v.

HART BREWING, INC.; George Hancock; John Stoddard; Don Burdick; John E. Morse; Peter T. Morse; John T. Bryce; Marcia L. Ellis; Janet Morse; Paine Webber, Inc.; Dean Witter Reynolds, Inc., Defendants–Appellees.

No. 97–55199.

United States Court of Appeals,
Ninth Circuit.

Argued April 7, 1998.

Decided May 14, 1998.

James C. Krause, Patrick N. Keegan, Krause & Kalfayan, San Diego, CA; Burton H. Finkelstein, Finkelstein, Thompson & Loughran, Washington, DC, for plaintiff-appellant.

Stellman Keehnel, Peter S. Ehrlichman, Tim J. Filer, Foster Pepper & Shefelman PLLC, Seattle, Washington; Shirli Fabbri Weiss, Gray Cary Ware & Freidenrich, San Diego, California, for defendants-appellees Hart Brewing Inc., George Hancock, John Stoddard, Don Burdick, John E. Morse, Peter T. Morse, John T. Bryce, Marcia L. Ellis and Janet Morse.

William F. Alderman, John H. Kanberg, Tanya Herrera, Orrick, Herrington & Sutcliffe LLP, San Francisco, California, for defendants-appellees PaineWebber Incorporated and Dean Witter Reynolds, Inc.

Before: FARRIS, O'SCANNLAIN, and FERNANDEZ, Circuit Judges.

FARRIS, Circuit Judge:

## BACKGROUND

Pyramid Breweries Inc., formerly Hart Brewing Inc., a maker of craft beers, conducted an initial public offering on December 13, 1995, less than three weeks before the end of the fourth quarter. Shares were priced at $19, netting the company $34.2 million.

According to Pyramid's uncontested prospectus, gross sales grew at a compound annual rate of around 88% from 1990 to the

end of the third quarter 1995. Operating income grew at a compound annual rate of 200% from 1990 through 1994. The prospectus also disclosed that income was merely 83% higher for the first three quarters of 1995 compared to the same period in 1994, thus suggesting a slowdown at Pyramid.

Pyramid's annual production capacity grew from 9,300 barrels in 1990 to almost 160,000 barrels at the time of the offering. The company had an annual capacity of 87,000 in 1994 and 72,100 barrels were shipped (83% of capacity); its capacity for the first three quarters of 1995 was 152,300 barrels, of which 89,100 were shipped (58.5% of capacity). *Id.* at 15. In other words, the company disclosed in its selected financial data that it had nearly doubled capacity in 1995, and that the amount of beer it produced was not increasing proportionately. It announced in its prospectus that its annual production capacity would be further increased to 290,000 barrels by the end of 1996.

The company also included four pages of risk factors in the prospectus, which warned investors, among other things, that "there is no assurance that the same level of sale and operating margins can be maintained in existing markets or achieved in new markets."

In the first 45 days or so of trading (to January 31, 1996), the share price declined to around $15.00. Pyramid announced its results for the fourth quarter of 1995 on February 1, 1996. The results were essentially flat. The fourth quarter results showed that net sales had declined from $6.77 million in the third quarter to $6.48 million in the fourth, a decrease of about 4%. Operating income had also decreased, by about 2%. The rate of barrels sold per quarter declined slightly, from 34,900 to 34,000. The prospectus also included figures which showed that fourth quarter results had been essentially flat in 1994 and 1993 as well. Moreover, the sales and income figures in the fourth quarter of 1995 were up 88% and 228%, respectively, from corresponding data for the fourth quarter of 1994.

Following the release of the flat fourth quarter 1995 results, Pyramid's share price rose to $16.00 by February 5, 1996.

Jeffrey Steckman bought 100 shares at the offering price on the first day of trading, December 13. By June, 1996, the share price had declined to $12.125 per share. On June 12, Steckman sold his shares and initiated this class action lawsuit in district court. Steckman alleged that Pyramid knew that a plateau in sales and earnings had been reached in the third quarter of 1995, and that subsequent quarters would experience declining sales.

According to Steckman, the defendants must have known of the flat results at the time of the IPO because they were able to announce, in the middle of the first quarter of 1996, that first quarter earnings would be off analysts' expectations. He concluded that, since Pyramid had this knowledge *mid-quarter*, it must have also had mid-quarter information at the time of the IPO, which would indicate that future sales and revenue would be flat.

The district court entered judgement under Fed.R.Civ.P. 12(b)(6) in favor of the defendants before any discovery was conducted and denied with prejudice Steckman's motion to amend the complaint. Steckman appealed. We affirm.

## DISCUSSION

■ The district court's order granting Pyramid's motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is reviewed *de novo. Cohen v. Stratosphere Corp.,* 115 F.3d 695, 700 (9th Cir.1997). If support exists in the record, the dismissal may be affirmed on any proper ground, even if the district court did not reach the issue or relied on different grounds or reasoning. *Gemtel Corp. v. Community Redev. Agency,* 23 F.3d 1542, 1546 (9th Cir.1994). On the other hand, a complaint should not be dismissed unless it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Johnson v. Knowles,* 113 F.3d 1114, 1117 (9th Cir.1997). *See* Fed.R.Civ.P. 12(b)(6).

■ In applying this standard, we must treat all of plaintiff's factual allegations as true. *Experimental Eng'g Inc. v. United Technologies Corp.,* 614 F.2d 1244, 1245 (9th Cir.1980). However, we are not required to accept as true conclusory allegations which are contradicted by documents referred to in

the complaint. *In re Stac Electronics Securities Litigation,* 89 F.3d 1399, 1403 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997). "[D]ismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." *Chang v. Chen,* 80 F.3d 1293, 1296 (9th Cir.1996).

The trial judge found that Steckman conceded an inability, under an "extreme departure" standard, to make *any* allegations sufficient to state a claim. Steckman denies any such concession and argues that "extreme departure" is the wrong standard. He argues that, under the proper standard, "materiality," he has stated a claim or, alternatively, he should be allowed leave to amend his complaint.

The defendants argue that "extreme departure" is the proper standard for determining whether a registrant has a duty to disclose mid-quarter financial information, and, even if the court declines to apply the "extreme departure" standard, the undisputed facts show that no adverse trend existed at the time of the IPO, that the share price *rose* when the supposedly known and improperly withheld financial data was finally released, and that the risks were completely disclosed.

Pyramid also argues that Steckman has failed to plead a sufficient claim under section 12(a)(2) by making no allegations that the company was a "seller," as required by the statute.

The underwriters also argue that an alleged violation of Securities and Exchange Commission Regulation S–K does not necessarily give rise to a cause of action under sections 11 and 12(a)(2) of the Securities Act of 1933, and that Steckman's pleadings, even if they did state the elements required to show a violation of Item 303 of Regulation S–K, would not be sufficient to state a cause of action under the Securities Act.

**a. Is there a cause of action under sections 11 and 12(a)(2) of the Securities Act?**

The underwriters' last argument poses threshold issues. We discuss it first. Allegations which state a claim under Item 303(a) of Regulation S–K also sufficiently state a claim under Sections 11 and 12(a)(2).

■ Form S–1, which Pyramid used in its registration, requires the registrant to follow Item 303. There is liability under section 11 if a registrant "omit[s]' to state a material fact required to be stated" in the registration statement. *See* section 11(a). Therefore, any omission of facts "required to be stated" under Item 303 will produce liability under Section 11. Thus, allegations which sufficiently state a claim under Item 303 also state a claim under section 11.

The underwriters point to numerous decisions which decline to find liability merely because Item 303 was violated. *See, e.g., In re VeriFone Securities Litigation,* 11 F.3d 865, 870 (9th Cir.1993). However, the cases upon which the underwriters rely were all decided under section 10(b). Section 10(b) of the Exchange Act, which has only an implied right of action, differs significantly from Sections 11 and 12(a)(2) of the Securities Act, which have express rights of action. At least one other circuit has noted that "disclosures mandated by law are presumably material." *Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628, 641 n. 17 (3d Cir.1990). We decline to extend *VeriFone,* a section 10(b) case, to Item 303 claims brought under section 12(a)(2). Allegations which would support a claim under Item 303(a)(3)(ii) are sufficient to support a claim under section 12(a)(2).

**b. Are Steckman's allegations sufficient to survive dismissal?**

Item 303(a)(3)(ii) of Regulation S–K of the Securities Act requires that a registrant

[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

17 C.F.R. § 229.303(a)(3)(ii). According to the Securities and Exchange Commission's 1989 release interpreting Item 303(a),

[a] disclosure duty exists where a trend, demand, commitment, event or uncertainty is *both* [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation.

Management's Discussion and Analysis of Financial Condition, Securities Act Release No. 6835 (May 18, 1989), Fed. Sec. L. Rep. (CCH) ¶ 72,436, at 62,143, reprinted at ¶ 73,-193, at 62,842 (emphasis added). Whether a company has a duty to disclose is governed by the following formula:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1) is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that [fruition of the trend] is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required *unless* management determines that a *material effect* on the registrant's financial condition or results of operations *is not reasonably likely to occur.*

*Id.* at 62,843 (emphasis added).

Since we must give substantial deference to the SEC's interpretation of the securities laws, *Environmental Action, Inc. v. SEC,* 895 F.2d 1255, 1259 (9th Cir.1990), we adhere to this formula. It closely tracks the requirements of Item 303. It mandates not only knowledge of an adverse trend (which defendants argue is the standard) and material impact (which Steckman argues is the standard), but also that the future material impacts are *reasonably likely to occur* from the present-day perspective. *See also* Item 303(a)(3)(ii) ("Describe any known trends ... that the registrant *reasonably expects* will have a material favorable or unfavorable impact").

The "reasonably expects" language in Item 303(a)(3)(ii) helps distinguish statements of known facts relating to the future, which are mandatory, from forward-looking statements, which are not required. *See* Regulation S–K, Instruction 7 to Item 303(a). Only when future impacts are "reasonably likely to occur" do they cease to be optional forecasts and instead become present knowledge subject to the duty of disclosure.

This analysis conforms with the distinction promulgated by the SEC in its 1989 release:

Both required disclosure regarding the future impact of presently known trends, events or uncertainties and optional forward-looking information may involve some prediction or projection. The distinction between the two rests with the nature of the prediction required. Required disclosure is based on currently known trends, events and uncertainties that are *reasonably expected to have material effects,* such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract. In contrast, optional forward-looking disclosure involves anticipating a future trend or event or *anticipating a less predictable impact of a known event,* trend or uncertainty.

Securities Act Release No. 6835, ¶ 73,193 at 62,842 (emphasis added).

■ Taking all of Steckman's allegations as true, he has failed to state a claim under Item 303(a)(3)(ii) for which relief can be granted.

The first element is the showing of a known adverse trend. A slowdown after a period of growth might be a trend. *See* Securities Act Release No. 6835, ¶ 73,193 at 62,842. Steckman alleged the following facts which, if true, show a slowdown at Pyramid: selling, general, and administrative (SG & A) expenses in the fourth quarter increased to $1.2 million from a previous average of $700,-000, thereby depressing profit margins; sales of barrels per quarter decreased 3%; net sales decreased 4%; and operating income decreased 2%. As for Pyramid's knowledge of this slowdown at the time of the IPO, Steckman has also made sufficient allegations. He points to a press release made in the middle of a later quarter in which Pyramid disclosed that upcoming quarterly results would be worse than expected. Therefore, Pyramid knew of or could have reasonably expected the slowdown in the middle of the IPO quarter.

However, with respect to the next element of Item 303(a)(3)(ii), Pyramid's management could not under any imaginable standard

have reasonably expected that the slowdown was anything more than a regular fourth quarter slowdown or that it would have a material impact on net sales, revenues or income. As the trial court pointed out, uncontested materials submitted with the complaint showed that (1) sales in the fourth quarter of 1995 were 88% *higher* than in the fourth quarter of 1994, (2) operating income was *up* 228% in the fourth quarter of 1995 compared to the same quarter 1994, (3) earnings per share were *up* 30% between the two periods despite an increase in shares outstanding, (4) the share price *increased* when the results of the fourth quarter were made public early in the next quarter, and, most importantly (5) Pyramid had experienced a pattern for the two previous years in which fourth quarter earnings were the same or slightly below third quarter earnings in a given year. Based on such positive factual data, the allegations failed to raise a factual question of whether management knew that there was a trend *and* unreasonably failed to predict that there was a likelihood that the company's future earnings and profits would be materially affected.

Nor could Steckman's amended complaint state a claim. Taking all allegations as true, the new complaint fails to allege any facts by which management could reasonably expect that the known trend would have a material impact on the company's revenues, sales, etc. The allegation that Pyramid was increasing its accounts receivable in the fourth quarter of 1995 to "borrow" from sales in the first quarter of 1996 amounts to nothing. Accounts receivable naturally grow over time as a company's sales grow. A 3% difference is too insignificant to show knowledge of an adverse trend which could be reasonably expected to have a material impact.

Steckman's "channel stuffing" allegation also fails to support a claim that Pyramid violated its duty to disclose under Item 303(a). Channel stuffing is the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply. This claim is speculation made in hindsight.

■ Although there is a general rule that parties are allowed to amend their pleadings, it does not extend to cases in which any amendment would be an exercise in futility, *Pisciotta v. Teledyne Industries, Inc.*, 91 F.3d 1326, 1331 (9th Cir.1996), or where the amended complaint would also be subject to dismissal, *Saul v. United States*, 928 F.2d 829, 843 (9th Cir.1991). Steckman's amended complaint would be an exercise in futility. Dismissal with prejudice was properly entered.

Steckman has failed to state a claim under Item 303. We therefore do not reach the issue of whether the company is a statutory "seller" under Section 12(a)(2). We also decline to pass on the validity of an "extreme departure" threshold in this circuit.[1] We need not reach the issue of just how bad a trend must be before management might reasonably expect it to have material effects. The facts would not support reasonable likelihood under any threshold.

AFFIRMED.

---

1. We do, however, counsel the need for caution in glossing the SEC's language regarding known trends "reasonably expected to have material effects" with further enigmatic language such as "extreme departure" or "dramatic decrease." Short phrases can not fully capture the richness of the concepts behind the standards; short phrases may obfuscate rather than clarify the standards.