**In re ICN PHARMACEUTICALS, INC., SECURITIES LITIGATION**

**No. SACV 02–701 DOC.**

United States District Court, C.D. California.

Jan. 5, 2004.

Jeffrey S. Abraham, Abraham & Associates, New York City, Robert Scott Dreher, Robert S. Dreher Law Offices, San Diego,

CA, Christopher L. Nelson, Jacob A. Goldberg, Stuart L. Berman, Schiffrin & Barroway, Bala Cynwyd, PA, Daniel L. Germain, Rosman & Germain, Los Angeles, CA, Robert S Green, Robert A. Jigarjian, Green & Jigarjian, San Francisco, CA, for Plaintiff.

Eric S. Waxman, Carl Alan Roth, Peder Kristian Batalden, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, CA, for ICN Pharmaceuticals, Inc., Richard A. Meier, John E. Giordani and Bill Mac-Donald.

Pierce O'Donnell, Ann M. Mortimer, C. Kendie Schlecht, O'Donnell & Shaeffer, Los Angeles, CA, for Milan Panic.

Sanford M. Litvack, Thad A. Davis, Ryan G. Baker, Quinn Emanuel Urquhart Oliver & Hedges, Los Angeles, CA, for PricewaterhouseCoopers.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

CARTER, District Judge.

Before the Court is Defendants ICN Pharmaceuticals, Inc.'s, Richard Meier's, John Giordani's and Bill MacDonald's motion to dismiss Plaintiffs' consolidated amended complaint. Defendants Milan Panic and PriceWaterhouse Coopers also make separate motions to dismiss Plaintiffs' consolidated amended complaint. After reviewing the moving, opposing and replying papers, hearing oral argument, and for reasons set forth below, the Court GRANTS the motions and (1) dismisses Plaintiffs' complaint as to Defendants ICN Pharmaceuticals, Inc, Richard Meier, John Giordani, Bill MacDonald, and Milan Panic with leave to amend; and (2) dismisses Plaintiffs' complaint as to Defendant Price Waterhouse Coopers without leave to amend. Accordingly, the motion by De-fendants ICN Pharmaceuticals, Richard Meier, John Giordani, and Bill MacDonald, joined by Defendant Milan Panic to strike certain allegations from the complaint is DENIED as MOOT. Also, the motion by lead Plaintiff to file a memorandum of law in opposition to Defendants' motion to strike is DENIED as MOOT.

### I. BACKGROUND

This action is brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) (the "Act") and the rules and regulations promulgated thereunder by the SEC, including 17 C.F.R. 240.10b–5 ("Rule 10b–5"). On May 26, 2003, Plaintiffs filed a consolidated amended complaint ("CAC") alleging violations of the Act and Rule 10b–5 on behalf of a class of investors who bought stock in ICN Pharmaceuticals, Inc. ("ICN") between May 3, 2001 and July 10, 2002 (the "Class Period"). Defendants are ICN, certain of its officers and directors, and Pricewaterhouse Coopers ("PWC"), ICN's auditor. Plaintiffs allege that Defendants improperly engaged in channel stuffing with respect to numerous products to artificially inflate ICN's revenues and earnings. Plaintiffs allege that Defendants also caused ICN to falsify sales, and accordingly, to record and report revenues that ICN had not earned.

Plaintiffs also allege that, during the Class Period, ICN repeatedly touted its growing revenues from ICNRUS (ICN's Russian Operation), ICN's dominance of the Russian pharmaceutical market in both the retail and manufacturing contexts, and promised further investment in Russia to boost its sales, when in fact INCRUS faced serious problems. Plaintiffs allege that it was apparent to Defendants that ICNRUS operations were materially impaired, such that by the beginning of the Class Period, the revenue and earnings

problems called into serious question the value of ICNRUS' manufacturing assets. This was compounded by a material overstatement of ICNRUS' physical assets, circumstances of which the Defendants were allegedly well aware at the beginning of the Class Period, and of which PWC became aware by summer 2001.

In late 2000, ICN began selling laser products, primarily Nlite, through its Photonics Division. Plaintiffs allege that with knowledge that Nlite was deeply flawed and inferior to competing products, Defendants concealed its deficiencies from the investing public. When sales began to lag, Defendants falsified them by installing Nlite machines in doctors' offices for free and then improperly treating the installation as a sale.

Pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6), Defendants ICN, and individual Defendants Richard A. Meier ("Meier"), John E. Giordani ("Giordani"), and Bill MacDonald ("MacDonald") move to dismiss Plaintiffs' CAC. Defendants Milan Panic ("Panic") and PWC have also filed separate motions to dismiss.

Thus, the issue before the Court is whether the CAC states a claim under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78a et seq.

## II. DISCUSSION

■■■ The pleading requirements for securities fraud actions are articulated in the PSLRA. 15 U.S.C. §§ 78u–4(b)(1), (2). "The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir. 2002) (citing *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir.2001)). "The purpose of

this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'" *Id.* at 1084–85 (citing *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 973 (9th Cir.1999)). To meet this heightened pleading requirement, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* at 1085 (citing 15 U.S.C. §§ 78u–4(b)(1)). The second requirement of the PSLRA is that the complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* (citing 15 U.S.C. §§ 78u–4(b)(2) (emphasis added)). "[T]he complaint must allege that the defendant made false or misleading statements either intentionally or with deliberate recklessness...." *Id.* [citations omitted]. Facts showing mere recklessness or a motive and opportunity to commit fraud are not sufficient to establish a strong inference of deliberate recklessness. Plaintiffs must come closer to demonstrating intent, as opposed to mere motive and opportunity. *Silicon Graphics,* 183 F.3d at 974. Moreover, under the PSLRA "when determining whether plaintiffs have shown a strong inference of scienter, the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs. District courts should consider all the allegations in their entirety, together with any reasonable inferences that can be drawn therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter."

*Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir.2002) (emphasis added).

As against Defendants ICN, Panic, Mac-Donald, Meier and Giordani, Plaintiffs allege that the Defendants: 1) engaged in channel stuffing throughout the Class Period, 2) regularly falsely reported sales of ICN products during the Class Period, 3) failed to disclose the myriad of business problems facing ICNRUS and failed to write down materially impaired ICNRUS assets, 4) engaged in a host of improper practices with respect to the Photonics Division, and 5) violated GAAP. In support of these allegations, Plaintiffs also allege that the individual Defendants engaged in suspicious insider trading and were motivated by huge bonus payments received upon the completion of the Ribapharm IPO.

As against Defendant PWC, Plaintiffs allege that PWC issued a false and misleading audit opinion and quarterly reviews certifying misleading financial statements by ICN as to its Russian operations, with knowledge of adverse facts.

## A. Analysis of Plaintiffs' Allegations Against ICN, Panic, MacDonald, Meier, and Giordani

### 1. Allegations Concerning ICN's Channel stuffing

█ Plaintiffs first allege that Defendants improperly engaged in channel stuffing with respect to numerous products to artificially inflate ICN's revenues and earnings. "Channel stuffing is the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply." *Steckman v.*

*Hart Brewing, Inc.,* 143 F.3d 1293, 1298 (9th Cir.1998). Plaintiffs allege Defendants would offer huge discounts at the end of a quarter to increase the sales figures for the quarterly results.

Channel stuffing claims are disfavored in this Circuit. *In re Splash Tech. Holdings Inc., Sec. Litig.,* 160 F.Supp.2d 1059, 1076 (N.D.Cal.2001) (citing *In re Ashworth, Inc. Sec. Litig.,* 2000 WL 33176041, *7 (S.D.Cal.2000) (citing *Steckman,* 143 F.3d at 1298)). In *Steckman,* the Ninth Circuit stated that such a "claim is speculation made in hindsight." *Steckman,* 143 F.3d at 1298. Here, Plaintiffs plead no specific facts to support a conclusion that in this case their claim is not speculation made in hindsight. The CAC shows nothing more than ICN's business decision to offer discounts to reach its sales targets. "Channel stuffing claims may have probative value insofar as the channel stuffing was done so as to artificially inflate income, but there may also be other legitimate reasons for attempting to achieve sales earlier." *Broudo v. Dura Pharm.'s, Inc.,* 339 F.3d 933, 940 (9th Cir.2003). For example, Plaintiffs state that this practice was particularly notable with respect to certain chemotherapy drugs whose normal market was cyclical with the weather and typically sold very poorly during the summer.[1] Plaintiffs allege that particularly in the Spring, the Company would offer incentives for wholesalers to buy more product than they otherwise would. However, this practice may simply have been done for the purpose of, and had the effect of, evening out sales of the product over the course of the year. The Court fails to see how this goal is inherently improper and agrees with the observation of the First Circuit in *Greebel v. FTP Software, Inc.,*

---

1. Plaintiffs state this was because the treatments were too painful to tolerate during the hotter months.

that "there is nothing inherently improper in pressing for sales to be made earlier than in the normal course." 194 F.3d 185, 202 (1st Cir.1999); *see also Ashworth,* 2000 WL 33176041 at *7. Finally, as Defendants note, for channel stuffing to be improper logically it must be a short-lived scheme in which the wrongdoer attempts to capitalize on artificially increased sales *before* the resulting drop in sales. If channel stuffing occurs over time, the pattern of increased sales toward the end of each quarter and lower sales at the beginning of each quarter would be quite transparent to investors, and thus could not form the basis for an allegation of fraud. Plaintiffs rely on statements by a former Territory Manager for the Western Region, who states that ICN's channel stuffing started as early as the late 1990s. (CAC ¶ 36.) Thus, it was clearly an ongoing practice. For all the above reasons, the Court concludes that the Plaintiffs have not pled any facts from which an inference could be made that the Defendants engaged in improper conduct by engaging in channel stuffing.

Even if an inference of illegitimacy could be drawn from the Defendants' behavior, Plaintiffs have not provided corroborating details to meet the heightened pleading standard of the PSLRA. Although Plaintiffs list the name of two distributors, the CAC generally fails to allege "specific transactions, specific shipments, specific customers, specific times, or specific dollar amounts." *Ashworth,* 2000 WL 33176041 at *6. Plaintiffs also fail to provide any corroborating details about orders reportedly received by Territory Managers to "load" at the end of each quarter; or sales meetings where channel stuffing was "regularly discussed."

## 2. Allegations Concerning ICN's fake sales

■ Plaintiffs allege that Defendants regularly falsely reported sales of ICN products during the Class Period. Plaintiffs support these allegations with a statement from a former ICN Territory Manager from the Carolinas region that his actual sales numbers were regularly rejected by ICN in favor of made-up sales figures. Plaintiffs also allege that in accordance with ICN's policy of "selling no matter what it took," the Defendants not only committed financial fraud, but also created dangerous conditions for patients by promoting "off-label" use of certain ICN pharmaceuticals and by re-dating and selling expired pharmaceuticals.

These allegations are also notably lacking in corroborating details. First, the CAC fails to allege any specifics about discrepancies between the figures reported by the Territory Manager and the figures publicly reported, such as amounts, in what reports, and where in the reports the discrepancies could be identified. Second, the CAC provides no specifics about transactions, shipments, dates, customers and so on, of sales that were faked or pharmaceuticals that were re-dated. Third, the CAC provides no corroborating details about sales meetings at which employees who were uncomfortable with the program were allegedly kicked out of the meeting, such as dates, places, names of employees who were kicked out and names of those who did the kicking out. Nor does the CAC provide any details of an email allegedly sent to Panic complaining about this practice, or the names and circumstances of employees who allegedly were fired after complaining about this practice. Thus, as in *Silicon Graphics,* Plaintiffs plead virtually no facts to corroborate their allegations, and instead simply provide a list of sources from whom they allegedly obtained their information. *See Silicon Graphics,* 183 F.3d at 985. Finally, and most basically, the CAC omits mention of the amounts by which ICN purportedly

overstated revenues. In the absence of such specifics, the Court cannot ascertain whether there is any basis for the allegation that "ICN's improper means of enhancing revenue were rampant during the Class Period."[2] (Pls.' Opp'n at 12).

### 3. Allegations Concerning Failure to Disclose ICNRUS' Business Problems and its Materially Impaired Assets

■ Plaintiffs allege that Defendants' concealment of ICNRUS' business problems constitutes fraud. Plaintiffs first allege that the Defendants failed to disclose the deplorable state of ICNRUS' manufacturing facilities. Specifically, they allege that ICN purchased three manufacturing facilities in Russia, and pledged upwards of $1 billion to update the facilities—money that ICN did not have. As a result of ICN's failure to update the facilities, the regional governments from which ICN had purchased the facilities began to assert greater control over the facilities. Moreover, these manufacturing facilities were unproductive, and staffed by approximately 8,000 workers, many of whom were idle, but who could not be fired by ICN under the purchase agreement, resulting in a substantial drain on ICN. None of this was disclosed to the public. Plaintiffs also allege that ICN: failed to anticipate that under normal business conditions in Russia, up to 50% of its inventory would be stolen and resold on the black market; INCRUS had other inventory control problems; ICNRUS was ill-equipped to establish a distribution network and was unable to timely distribute pharmaceuticals, thus losing potential customers; and that overall, INCRUS' retail pharmaceutical strategy was unprofitable and unworkable.

Plaintiffs also allege that during the Class Period, ICNRUS overvalued 1) its three manufacturing facilities at Yoshkar-Ola, St. Petersburg, and Krsanoyarsk, 2) its manufacturing and distributing operations by at least $40,000,000, 3) its Moscow headquarters by at least $11,333,000, 4) INCRUS' warehouse adjacent to its Oktyabr plant by at least $5,000,000, 5) ICNRUS' warehouse on Vasilevsky Island, and 6) ICNRUS' student hostel building near St. Petersburg. ICN wrote-down its ICNRUS assets in the third quarter of 2002, but Plaintiffs contend that the Defendants knew or recklessly disregarded adverse circumstances that should have prompted ICN to write-down those assets far earlier.

Plaintiffs rely exclusively on assertions by Victor Dorodny ("Dorodny") in support of their allegations regarding ICNRUS. For example, Plaintiffs allege that "by the end of April, 2000, it was clear to Dorodny that the value of the Russian manufacturing facilities owned by ICN was severely impaired." (CAC ¶ 48). However, at that time, Dorodny represented a competitor of ICN, Gazprom OAO, and had done an analysis of ICN's operations in support of Gazprom's offer to purchase ICN's Russian manufacturing facilities. (CAC ¶ 47). Dorodny claims that Panic and MacDonald knew that ICN should have extricated itself from its Russian manufacturing operations at that time, but Panic refused to

---

**2.** Plaintiffs rely on *Schlagal v. Learning Tree Int'l* for the proposition that it is not fatal to the complaint that it does not describe in detail a single specific transaction. 1998 U.S. Dist. LEXIS 20306, at *22–23 (C.D.Cal.1999). However, *Schlagal* relies heavily on the Ninth Circuit's determination in *Cooper v. Pickett,* 137 F.3d 616 (9th Cir.1997). *Cooper* has been superseded, as the Ninth Circuit noted in *In re Vantive Corp. Sec. Litig.,* because it was decided under the law as it existed prior to the PSLRA. 283 F.3d 1079, 1091 (9th Cir. 2002).

sell. (CAC ¶ 50). Plaintiffs fail to provide facts indicating why an analysis by a competitor and an offer of purchase translates to ICN or the other defendants having actual or constructive "knowledge" such that ICN fraudulently concealed that its business problems. Even if ICN was "told" during the negotiations for purchase of all the reasons why it should sell, that information was coming from a party that had divergent interests from ICN. Plaintiffs also fail to allege Dorodny's expertise with regard to these valuations.

Plaintiffs' complaint, as it relates to the ICNRUS allegations, must be dismissed because it does not plead with particularity facts giving rise to a strong inference that the Defendants acted with the required state of mind, i.e. either intentionally or with deliberate recklessness. *Broudo v. Dura Pharmaceuticals, Inc.*, 339 F.3d 933, 938 (9th Cir.2003). Indeed, the only facts that Plaintiffs allege as to Defendants' state of mind are contained in Paragraph 77 of the Complaint:

> According to Dorodny [a former ICN Vice President of Corporate Development], it is highly unlikely that Panic and MacDonald did not know the circumstances of ICNRUS, in detail. First, MacDonald knew of the manufacturing and distribution problems because Dorodny told him directly. Further, Vasic had Panic's ear. Panic traveled to Russia once a month and before he arrived Vasic would give him a detailed report of the situation on the ground. Further, Ortega, whom Dorodny described as a "straight shooter" and a person of integrity, was on the phone with senior ICN personnel in Costa Mesa every night. According to Dorodny, the contact was even closer around July of 2001 when ICN issued its $525 million offering of 6 1/4% senior convertible notes. Dorodny remembers that everyone, including Panic,

Vasic, MacDonald, and Ortega, was concerned that the truth about IC-NRUS could scuttle that deal. Further, senior ICN personnel including MacDonald and the CFO received daily communications and weekly reports from ICNRUS and responded to those reports with comments and plans to remedy the most acute of ICN's problems. In turn, Ortega conveyed those comments and plans to remedy problems directly to ICNRUS personnel. Approximately 90% of those communications with Costa Mesa were via email...

As in *Silicon Graphics*, Plaintiffs fail to state specific facts relating to the alleged communications that put ICN management on notice, with the exception of Dorodny's having "told them." *See Silicon Graphics*, 183 F.3d at 985. "We would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability." *Id.* The Court is provided no information about the content of the daily communications and weekly reports, nor the apparently voluminous emails. Plaintiffs note that Ortega, described by Plaintiffs' source Dorodny as a straight shooter, was on the phone every night with senior ICN personnel, but they fail to provide any information about the content of Ortega's communications. Ortega may have had a different view of the alleged problems facing ICNRUS and may have been conveying a very different picture to senior ICN personnel than that painted by Dorodny. Thus, in the absence of additional specifics, the Court cannot ascertain whether there is a basis for alleging that defendants had actual or constructive knowledge of ICNRUS's problems such that any representations to the contrary would

have to have been consciously misleading. *Id.* In sum, Plaintiffs have provided insufficient factual allegations to support both the extent of knowledge and the inference that the failure to recognize the alleged problems "was attributable to fraud, rather than a lack of caution, a lack of solid information, a belief that it was part of the company's grand expansion plans, or a momentary surplus of hubris." *See In re Guess?, Inc. Sec. Litig.*, 174 F.Supp.2d 1067, 1078 (C.D.Cal.2001). Thus, Plaintiffs' allegations do not comprise the kind of "strong circumstantial evidence" needed to establish that Defendants made false or misleading statements either intentionally or with deliberate recklessness.

█ The same is true regarding the allegations pertaining failure to disclose impaired material assets. Plaintiffs only speculate about when Defendants came to know about the impaired assets, and although they identify the assets that were impaired, they do not specify the amount by which a number of these assets (ICNRUS' three manufacturing facilities at Yoshkar–Ola, St. Petersburg, and Krsanoyarsk, ICNRUS' warehouse on Vasilevsky Island and ICNRUS' building near St. Petersburg) were impaired, and provide no factual support for the figures by which they allege other assets were impaired. Plaintiffs specify neither the purchase price and carrying values of these properties, nor the expected income stream from these properties. At oral argument, Plaintiffs directed the Court to *In re Vivendi Universal, S.A. Sec. Litig.*, 2003 WL 22489764 (S.D.N.Y.), for the proposition that other factors are sufficient to show that assets should be discounted. However, the Court finds that in *In re Vivendi*, Plaintiffs provided specific corroborating details, such as a memo prepared by Vivendi detailing that marketing rights to soccer contracts were not bona fide assets, as originally believed, and thus should be written off in Vivendi's year-end statement for the 2000 fiscal year, but they were not written off. Id. at *12.[3] Moreover, Plaintiffs have made no allegations that would demonstrate that ICN had an obligation under GAAP to impair its assets at a specific earlier time, but chose not to do so with an intent to defraud. Plaintiffs variously contend that "it was apparent by mid–2000 that ICNRUS operations were materially impaired (CAC ¶ 93)" and "Defendants knew these assets were improperly valued because Dorodny conducted an inspection and informed defendants of the improper evaluation by mid–2001." (Pls.' Opp'n at 16). Unlike a case in which the court found sufficient pleading detail, Plaintiffs have failed both to substantiate that Defendants committed a violation of GAAP and have failed to provide detailed evidence of the contemporaneous decision-making behind the alleged accounting errors that would combine to show the required scienter. *See In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *13, 2002 U.S. Dist. LEXIS 5887, at *41 (N.D.Cal.2002). Plaintiffs have therefore not pled with particularity as required under *Silicon Graphics* and its progeny. Furthermore, even a delinquent write-down of the impaired assets, without anything more, does not state a claim of securities fraud, stating at best a bad business decision.

Also, Plaintiffs admit that, in 2000 and 2001 ICN expanded its manufacturing and distribution network to become a leading pharmaceutical company in Russia (CAC ¶¶ 42–43), and that ICN slashed its losses

---

**3.** The Court also notes that the Second Circuit has different pleading standards under the PSLRA than the Ninth Circuit.

from $17 million to $4 million and improved its market position (*Id.* at ¶ 68). Given these facts, it is equally plausible that ICN did not impair assets during the Class Period because it believed that it was successfully addressing problems and its business prospects were bright. Plaintiffs have thus not alleged with particularity facts giving rise to a strong inference that the Defendants acted either intentionally or with deliberate recklessness.

### 4. Allegations Concerning ICN's Laser–Based Products

■ Plaintiffs allege that ICN hid the fact that its product NLite was flawed and patently inferior to competing laser products from the investing public. The NLite system cost 20–30% more than competing products, which were far superior even when cost was not taken into consideration. Plaintiffs allege that numerous ICN employees stated that the product was deeply flawed and that they were instructed by their superiors to conceal this from ICN's customers. Plaintiffs allegations are very similar to allegations dismissed by the court in *In re Vantive Corp. Sec. Litig.* and fail on the same grounds:

> Similar deficiencies inhere in the complaint's allegations that the defendants lied when representing that Vantive 'was successfully developing/had successfully introduced Vantive Sales (Version 7) for release.' There are simply no details in the allegations that would make these representations false—allegations that Vantive Version 7 'was not well received by customers, was known to be a 'disaster' inside the Company, as several of its software modules did not work properly' that deployment of the product resulted in 'serious problems' for Vantive sales operations, 'requiring the investment of significant management resources . . . to cure these operational problems' and that Vantive 7 was 'not commercially

viable due to defects in the product.' Nor are any corroborating facts alleged, or sources stated, for the allegation that Luongo 'secretly ordered' that Vantive 7 not be sold and that it be used as a pilot product until Vantive 7.5 could be introduced.

283 F.3d 1079, 1088 (9th Cir.2002).

Plaintiffs also allege that ICN would install NLite machines for free and fraudulently book the transaction as a sale, thus inflating the appearance of revenue. ICN would resell defective and expired returned cartridge dye kits used in the NLite machines to another customer, thus creating the appearance of revenue from the cartridge. These allegations are far too general to satisfy the requirements of the PSLRA. Among necessary corroborating facts missing from Plaintiffs complaint are: i) names of customers, ii) dates, times and locations of free uses, returns, or resales, and iii) the amounts by which such transactions purportedly overstated ICN's revenues. See, e.g., *Vantive*, 283 F.3d at 1091; *In re Ashworth, Inc. Sec. Litig.*, 2000 WL 33176041, at *16–17 (S.D.Cal.2000); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 204 (1st Cir.1999).

■ Finally, Plaintiffs claim that ICN commingled its books with the Photonics division after its spin-off to conceal or obscure losses. These allegations are also devoid of the requisite corroborating details, such as the dollar amounts in question, the nature of the assets, or the identities of ICN employees who allegedly perpetrated acts of fraud.

### 5. Allegations Concerning Accounting Fraud

■ Plaintiffs allege that ICN committed accounting fraud by violating GAAP in the following manners:

1. By overstating revenue from sales of equipment that were given to physicians for free. (CAC ¶¶ 87, 91).

2. By reporting revenue from pre-shipped orders. (CAC ¶ 87).

3. By recording sales from deeply discounted products with rights of return and extended payment terms. (CAC ¶ 92).

4. By failing to assess and record the impairment charge on the Russian properties in the proper time period. (CAC ¶¶ 93–96).

5. By failing to properly record expenses. (CAC ¶ 97).

 GAAP violations must be pled with particularity. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1021 (5th Cir.1996). As discussed above, Plaintiffs' allegations are conclusory and do not state the requisite specifics, including particular transactions in which revenues were improperly recorded, including the names of the customers, the terms of specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions. Most important, Plaintiffs do not state the "approximate amount by which revenues and earnings were overstated"—a necessary "basic detail" in accounting fraud allegations. *Vantive*, 283 F.3d at 1091 (citing *Greebel*, 194 F.3d at 204).

### 6. Scienter Allegations

#### a. *Analysis of Allegations of Insider Trading*

Plaintiffs allege that certain sales of ICN stock by Defendants Panic, MacDonald, Meier, and Giordani raise an inference of scienter.

 Unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter. *Silicon Graphics*, 183 F.3d at 986. A suspicious sale is one that is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* (citing *In re Apple Comp. Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989)). "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.*

#### *Defendant Panic*

Panic sold between $23,500,00 and $31,000,000 worth of ICN stock between June 11–14, 2002. Plaintiffs allege that over the "six years preceding the Class Period, [Panic] sold a mere 20% of the total number of shares that he sold in the six months preceding the Company's July 11, 2002 disclosure that caused the Company's stock to plummet." (CAC ¶ 181).

However, as the CAC notes, on June 12, 2002, dissident shareholders were successful in having all of their nominees elected to ICN's board, which precipitated Panic's immediate retirement as CEO. (CAC ¶¶ 167, 168). Interestingly, according to the CAC, the proxy fight was initiated because two large institutional investors believed ICN's stock traded as a significant *discount* to its intrinsic value. (CAC ¶ 145). In any event, the Court concludes that Plaintiffs have not shown sufficient facts to demonstrate that Panic's sale raises an inference of scienter in the context of his resignation as Chairman and Chief Executive Officer of ICN on the same date as the sale of his stock, in the wake of a losing proxy battle.

#### *Defendants MacDonald, Meier and Giordani*

 Meier sold all of his 3,500 shares of ICN stock on November 26, 2001 for a

net proceed of $100,000. Giordani sold between $3,900,00 and $5,100,000 worth of ICN stock on June 11, 2002, and Mac-Donald sold between $5,000,00 and $6,600,000 worth of ICN stock on June 14, 2002. The Complaint does not offer any information about the prior trading history of any of the three, without which it is difficult to determine the context in which the sales were made.[4] See *Vantive,* 283 F.3d at 1095 ("When a complaint fails to provide us with a meaningful trading history for the purposes of comparison, we have been reluctant to attribute significance to the defendant's stock sales....").

As to Meier's sale, which was for a tiny percentage of the total allegedly suspicious insider sales, and occurred about seven months before the Company's July 11, 2002 disclosure, Plaintiffs fail to allege facts demonstrating that the timing and amount of this sale is suspicious. See *Silicon Graphics,* 183 F.3d at 987 (Defendant's sales represented an insignificant portion of the allegedly suspicious sales and thus did not give rise to a strong inference of deliberate recklessness).

■ As to Giordani and MacDonald, the stock sales could potentially be suspicious. However, Plaintiffs fail to plead additional facts to support their contention. In particular, Plaintiffs do not provide facts regarding the sales as a percentage of each individual's total holdings. See *Silicon Graphics,* 183 F.3d at 986 ("[T]he proportion of shares actually sold by an insider to the volume of shares he could have sold is probative of whether the sale

was unusual or suspicious.") Also, Giordani and MacDonald were both Executive Vice Presidents of ICN. Thus, as Defendants note, they were also facing major uncertainty as to the direction of the company and the prospects for their own continued employment in the wake of the losing proxy battle and Panic's resignation. Plaintiffs do not address the context surrounding the sales. Thus, the Court concludes that Plaintiffs have not shown sufficient facts to demonstrate that Giordani's and MacDonald's stock sales raise an inference of scienter in light of these other crucial facts, and particularly since there is no allegation that the proxy battle itself was undertaken because of concerns about fraud and mismanagement. Finally, Plaintiffs make no allegations connecting Giordani and MacDonald with the allegedly misleading statements. Thus, Plaintiffs do not plead adequate facts as to their claim of insider trading.

#### b. Allegations Regarding the Ribapharm Bonus

■ Plaintiffs allege that Defendants Panic, MacDonald, Giordani, and Meier were motivated to engage in fraudulent accounting practices to receive the following bonuses in connection with the successful completion of the Ribapharm IPO: Panic—$33,050,000; MacDonald—$2,000,000; nine non-executive directors—$330,500 each.[5] (CAC ¶ 150). They allege that Defendants committed securities fraud to make ICN appear stable and profitable, so that the Ribapharm IPO could be

---

4. Plaintiffs seek to cure their omission by contending in their opposition papers that MacDonald had traded no ICN shares for two years preceding his June 2002 sale (Pls.' Opp'n at 39), and Meier had traded no ICN shares for ten months preceding his November 2001 sale (Pls.' Opp'n at 40). However, the Court must disregard these facts, since it is "constrained to consider the sufficiency of

allegations contained in the complaint, not in Plaintiffs' opposition papers." *Moskowitz v. Vitalink Comm. Corp.,* 751 F.Supp. 155, 157 (N.D.Cal.1990).

5. The Complaint makes no mention of any bonus payments received by either Meier or Giordani.

completed and they could receive their bonuses. (*Id.* ¶ 178). While Plaintiffs' allegations state a motive for the Defendants to commit securities fraud, Plaintiffs' complaint, when taken as a whole, fails to plead anything more than mere motive and opportunity to commit fraud, which is not sufficient to establish a strong inference of deliberate recklessness. *Silicon Graphics,* 183 F.3d at 973. Plaintiffs have not pled with particularity facts giving rise to a strong inference that the Defendants acted either intentionally or with deliberate recklessness.

## B. Allegations against PWC

■ PWC was engaged by ICN to provide independent auditing and accounting services. Plaintiffs allege that PWC knew or was reckless in not knowing that ICN's financial statements were prepared in violation of GAAP and were false and misleading.

■ A plaintiff alleging a violation of Section 10(b) and Rule 10b–5 against an independent auditor such as PWC must satisfy the requirements of the PSLRA by alleging with specificity that "the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 390 (9th Cir.2002) (citing *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1426–27 (9th Cir.1994)). The "mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *Id.* To allege a "strong inference of deliberate recklessness," Plaintiffs "must state facts that come closer to demonstrating intent,

as opposed to mere motive and opportunity." *Id.* (citing *Silicon Graphics,* 183 F.3d at 974). In *DSAM,* the Ninth Circuit held as inadequate, allegations against the independent auditor that it must have "consciously disregarded the improper revenue recognition because it had access to the documents that revealed [the company's] improper revenue recognition at the very time it conducted the original audit." *Id.* The Court found that, that fact by itself did not "strongly compel an inference of intentional or deliberately reckless conduct as opposed to ordinary carelessness." *Id.*

In contrast, in *In re Homestore.com,* the court, reasoned that the auditor's actually having itself questioned certain transactions and having objected to others indicated that the auditors knew of the questionable nature of the company's accounting, and found Plaintiffs' pleadings adequate. 252 F.Supp.2d, 1018, 1042 (C.D.Cal.2003). The Court held that the auditor "acted with deliberate indifference, if not conscious misconduct, when it refused to see the obvious, or to investigate the doubtful, improper transactions and revenue recognition carried out. . . . " *Id.* at 1043.

In this case, Plaintiffs allege that Dorodny inquired of a PWC partner, "Tony," regarding the recorded values of several of the properties located in Russia. Dorodny states that Tony and his staff were completely unaware of the values of the buildings or whether supporting information existed for those values. Plaintiffs allege that PWC never did an appropriate investigation to determine the value of IC-NRUS' assets and whether they should have been impaired.

The Court finds that Plaintiffs' allegations, while perhaps sufficient to show carelessness, do not give rise to a strong inference that the firm acted with intent to defraud, conscious misconduct, or deliberate reckless, and thus are insufficient to

plead scienter under PSLRA. See, *DSAM*, 288 F.3d at 389. Allegations that PWC failed to investigate the true values of the Russian assets based on one incident of Dorodny making an inquiry of a PWC partner cannot establish scienter.

### C. Totality of the Allegations

The Court finds, considering the allegations as a whole, that Plaintiffs have failed to plead with requisite particularity factual allegations of wrongdoing, and factual allegations necessary to establish that Defendants acted with the required state of mind.

### III. DISPOSITION

For the foregoing reasons, the Court DISMISSES WITH LEAVE TO AMEND Plaintiffs' Consolidated Amended Complaint as to Defendants ICN, Panic, Meier, MacDonald, and Giordani. As to Defendant PWC, the Court finds that amendment would be futile and DISMISSES WITHOUT LEAVE TO AMEND. The Court grants Plaintiffs 30 days to amend their complaint.

IT IS SO ORDERED.