FILED

OCT 12 2011

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | | |
|---|---|---|
| In re: | ) | BAP No.  CC-10-1199-KiPaD |
| | ) | |
| SAMUEL E. FANDAY, | ) | Bk. No.  SV 08-15139-MT |
| | ) | |
| Debtor. | ) | Adv. No. SV 08-1569-MT |
| _____ | ) | |
| | ) | |
| BARRY COE, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **M E M O R A N D U M**[1] |
| | ) | |
| SAMUEL E. FANDAY, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Argued and Submitted on September 23, 2011
at Pasadena, California

Filed - October 12, 2011

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Maureen A. Tighe, Bankruptcy Judge, Presiding

_____

Appearances:     Barry Coe, appellant, argued pro se;
No appearance by appellee, Samuel E. Fanday.

_____

Before: KIRSCHER, PAPPAS, and DUNN, Bankruptcy Judges.

_____

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Appellant-creditor, Barry Coe ("Coe"), appeals a judgment from the bankruptcy court in favor of debtor-appellee, Samuel E. Fanday ("Fanday"), on Coe's nondischargeability claims under 11 U.S.C. §§ 523 and 727.[2]  We AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

**A.   Prepetition Events.**

Fanday and Coe are both chemical engineers and former classmates from Georgia Tech.  Fanday is the inventor of a water treatment technology that removes heavy metals from industrial wastewater — the Pellu formula.  Between the mid-1990's and approximately 2005, Fanday had been working as an independent contractor treating wastewater for various businesses.  Fanday had also incorporated a business named Pellu Systems Georgia, Inc. in 1999.  Fanday moved to California in 2000 to work as a wastewater consultant for the U.S. Air Force.

In late 2005, Fanday had the opportunity to do business with U.S. Filter.  Fanday's current operation was not adequate to meet U.S. Filter's demands, so he contacted Coe to discuss a possible business partnership.  Coe agreed to partner with Fanday.  Fanday was to supply the Pellu formula technology and customer; Coe was to supply the necessary funding and engineering skills to set up the manufacturing facility.  Coe, who lived in New York, moved to California in February 2006, and the men immediately began setting up the business.  Prior to Coe's arrival, Fanday located a warehouse in Gardena, California for the manufacturing

---

[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "FRCP."

- 2 -

facility.  To save money, the men agreed to live in the office portion of the warehouse.

The men decided to incorporate the business under the name Pellu Systems, Inc.  Pellu Systems, Inc. was to offer chemical treatment and environmental consulting services.  On June 11, 2006, Fanday and Coe entered into a self-drafted "Promissory Agreement/Agreement of Intent" (the "Agreement"), a two-page document which set forth their respective obligations and other financial and management details of the corporation.  The men were to each hold 50% of the shares, and all company decisions were to be unanimous.  Coe's to-date expenditure of $75,000 on equipment and supplies was to be a loan to Pellu Systems, Inc., which was to be repaid with company profits "within a reasonable time of this [A]greement."  The Pellu formula was to be kept in a safe deposit box accessible only to Fanday and Coe.  The men further agreed that:

> No partner shall attempt or engage in any activity related to a hostile buyout of the other partner or form or engage in activity with another similar company as Pellu in terms of material content of business, unless other partner agrees.

Fanday and Coe filed their Articles of Incorporation for Pellu Systems, Inc. on June 19, 2006.

The relationship between the men quickly deteriorated and Pellu Systems, Inc. never came to fruition.  Between June and September 2006, local police responded to disturbances at the warehouse on at least eight occasions.  One altercation between the men in August 2006 resulted in Coe assaulting Fanday, which caused Fanday to seek a temporary restraining order in state court in September 2006.  Coe also sought a restraining order

against Fanday, but he later withdrew it. Fanday moved out of the warehouse and in with his cousin, Akie Noah ("Noah"), in or around August 2006. Coe ultimately had expended approximately $87,000 for Pellu Systems, Inc. by the time the men parted.

In September 2006, Coe sued Fanday in state court for breach of contract, breach of fiduciary duty, intentional interference with business relations, and injunctive relief. A default judgment was entered against Fanday in September 2007 for $371,747.89 (which included Coe's lost investment, moving expenses, estimated lost profits of U.S. Filter for one year, and interest). Fanday, and his agents or employees, were further enjoined and prohibited from "using, licensing, advertising, promoting, disclosing, selling, or in any way commercializing the Pellu Water Treatment System and Formula," as it is "the property of Pellu Systems, Inc." and "all information of any nature whatsoever related to the Pellu Water Treatment System and Formula is the exclusive and confidential trade secret of Pellu Systems, Inc." Notably, the default judgment did not state whether Coe prevailed on his claim for breach of contract, breach of fiduciary duty, or intentional interference with business relations. When Coe suspected that Fanday may have been using, in some fashion, the Pellu formula with his new employer, Wastech, Coe moved to amend the default judgment to include Fanday's fictitious business names - Pellu Chemical Company and Pellu Systems, Inc. The amended judgment was entered in January

///

///

///

- 4 -

2008.[3]  Coe obtained a Writ of Execution for the default judgment in June 2008.  In that same month, Coe began garnishing Fanday's wages.

**B.    Postpetition Events.**

Fanday filed a voluntary chapter 7 petition on July 22, 2008.  A § 341 creditor's meeting was held on August 28, 2008.  Coe attended the meeting.  During questioning by the chapter 7 trustee, Fanday testified that since he and Coe parted, he had been working as a chemist at Wastech for significantly reduced pay.  Fanday further testified that Coe had sued Wastech, alleging that Wastech was wrongfully using the Pellu formula.  Fanday also stated that Coe had stolen, and was still in possession of, the intellectual property associated with the Pellu formula, including Fanday's computer that contained work he did for the U.S. Air Force.  When Coe asked Fanday whether he was in possession of any intellectual property related to Pellu Systems, Inc., Fanday responded "no."  When Coe asked Fanday whether he had licensed or allowed anyone else to use the Pellu formula, Fanday responded "no."  The trustee then followed up with the same question regarding licensing of the Pellu formula

---

[3] On September 16, 2011, just one week before oral argument, Coe filed additional exhibits he wanted the Panel to consider. The exhibits include the pleadings Coe filed in the state court in support of his motion to amend the default judgment.  We are unclear whether these exhibits were ever presented to the bankruptcy court.  See Kirshner v. Uniden Corp. of Am., 842 F.2d 1074, 1077 (9th Cir. 1988)(papers neither filed with the court, admitted into evidence, nor otherwise considered generally cannot be part of the record on appeal).  Even if they were presented, Coe appears to be submitting them as "proof" of his damages incurred for Fanday's subsequent alleged violation of the injunction.  As we explain in more detail below, because Coe failed to quantify any such damages before the bankruptcy court, the additional exhibits do not help his case.

(or any other formula invented by Fanday); Fanday responded that he had no such licensing agreement.

On October 27, 2008, Coe, appearing pro se, filed an adversary complaint against Fanday seeking to except his default judgment from discharge under § 523(a)(4) and (a)(6), and seeking to deny Fanday's discharge pursuant to § 727(a)(2), (a)(3), and (a)(4)(A) and (D). To support his nondischargeability claims, Coe alleged the following facts. During the formation of Pellu Systems, Inc., Fanday had asked Coe to add Noah as a business partner. Although Noah had helped build the manufacturing facility, Coe did not know Noah to have any wastewater expertise or the ability to bring new customers, so Coe declined. Because Coe refused to add Noah as a partner, in August 2006 Fanday told Coe that he was "bailing out" of the business and that he was going to "shut down the company." Fanday also refused to do any further business with U.S. Filter. Fanday then asked Coe to sell his shares of Pellu Systems, Inc. to Noah for $20,000, which is far less than Coe had invested. When Coe refused to sell, Fanday told Coe to get the equipment out of the warehouse and leave. When Coe refused to leave, Fanday attempted to have Coe removed by showing police a lease different from the one Coe signed and that did not contain Coe's name, all in an effort to eliminate Coe and allow Fanday and Noah to continue the business. However, since Pellu Systems, Inc.'s business license was in Coe's name, police did not remove Coe from the premises. Fanday then attempted, unsuccessfully, to dissolve the corporation by sending a notice to the Secretary of State. Thereafter, according to Coe, Fanday refused to meet with Coe or return to the business.

Coe alleged that Fanday knew his malicious actions would financially harm Coe and cause him to lose his investment. Coe further alleged that Fanday had violated the state court injunction by using the Pellu formula with Wastech under various fictitious names. Coe alleged that he and Fanday had an express fiduciary relationship by way of the Agreement, and that Fanday's actions constituted a defalcation for purposes of § 524(a)(4). Coe alleged these same acts by Fanday were willful and malicious and caused Coe to lose his entire investment in Pellu Systems, Inc. in violation of § 523(a)(6).

To support his claims for denying Fanday's discharge under § 727, Coe alleged that Fanday was in possession of the Pellu formula, and Wastech had been advertising the Pellu formula on its website since 2007. Therefore, Fanday had misrepresented at the § 341 creditor's meeting that he had no intellectual property, such as formulas related to wastewater treatment, and he concealed his intellectual property by failing to report it on his schedules, in violation of § 727(a)(3) and (a)(4)(A). Coe contended that Fanday should be denied discharge under § 727(a)(2) because Fanday had used a fictitious address for Coe in order to delay and discourage Coe from attending the § 341 creditor's meeting.

Fanday, also appearing pro se, filed an answer on November 24, 2008. The answer was essentially a letter offering Fanday's abbreviated version of the facts; it did not specifically deny any of Coe's allegations. Fanday requested that the bankruptcy court "dismiss Barry Coe's motion as a waste of the court's precious time."

On December 4, 2008, Coe filed a "demurrer" to Fanday's answer contending that it failed to controvert any of Coe's allegations. Coe requested that the bankruptcy court enter a "default judgment to dismiss debtor's bankruptcy case." According to the bankruptcy court docket, no proof of service of the demurrer was ever filed, and Coe never set the matter for hearing. Other than the demurrer, no other pretrial motions or briefs were filed.

Trial on Coe's complaint proceeded on July 17, 2009. Both Fanday and Coe appeared pro se. None of the witnesses either of the men intended to call appeared.[4] Although Fanday and Coe were ordered to submit all trial exhibits by June 17, Coe brought his exhibits with him the morning of trial. Fanday objected to the late exhibits. The court determined that it would decide later which exhibits were admissible since perhaps none of them were even relevant.

The court allowed Coe ten minutes to present his opening argument. Since his argument was very detailed, the court considered it as part of his direct testimony. Fanday did not object to this ruling. In addition to reiterating the allegations in his complaint, Coe testified that Fanday became resentful when Coe refused to pay for certain improvements to the facility that Coe thought were impractical, such as installing a $24,000 piping system. Coe stated that his refusal to add Noah

---

[4] Coe explained that Noah was willing to appear, but that he was in Africa and would not be returning for two weeks. The bankruptcy court opted to take Coe's and Fanday's testimony and deal with any other witnesses later. Notably, Noah also failed to appear at the second day of trial on August 3, 2009, when he was presumably back in town.

as a partner was another point of contention that caused Fanday to abandon the business and the deal with U.S. Filter. Coe testified that Fanday breached his fiduciary duty when he went behind Coe's back to find another manufacturing site and new investors. Finally, Coe testified about what Fanday had stated at the § 341 creditor's meeting. Coe did not include in his exhibits a copy of the transcript from Fanday's § 341 creditor's meeting.

In his opening argument, Fanday contended that because the men had not yet incorporated their business, Fanday had to sign the warehouse lease in the name of his wholly-owned corporation, Pellu Systems Georgia. Fanday stated that he sent copies of the lease documents to Coe in New York only for his review, not to sign. As for additional improvements to the facility, Fanday explained that the equipment Coe had purchased would not satisfy the water demands of U.S. Filter or comply with city fire codes, but Coe disagreed. According to Fanday, Coe had no more money to invest in the business and they could not start manufacturing as it existed. This situation prompted Fanday to solicit Noah as a partner. Fanday offered to sell 20% of his shares to Noah for cash to finish the facility, but Coe refused. Then, the altercations began, so Fanday asked Coe to leave, particularly since Fanday was liable under the lease and he was concerned Coe might destroy the warehouse. Coe refused to leave. Fanday stated that after he moved out, Coe took everything out of the warehouse, including what Fanday claimed were his personal effects.

Coe then asked the bankruptcy court to apply issue

preclusion to the default judgment. The court was willing to consider it; however, Coe had not provided copies of the complaint or the proof of service, and the copy of the judgment he provided appeared incomplete.

After questioning Coe about the details of his alleged damages, the bankruptcy court continued the trial to August 3, 2009, to allow Coe time to submit the necessary documents from the state court proceedings and the transcript from the § 341 creditor's meeting.

The second day of trial went as scheduled on August 3, 2009. Coe continued on with his direct testimony, much of which was a repeat from July 17. Coe admitted that perhaps small modifications were needed before Pellu Systems, Inc. could fully operate, but, in his opinion, they were ready to start manufacturing. Coe further testified that at one point he offered to sell his shares to Noah for $50,000, but Fanday would not discuss it and instead called the police. Finally, according to Coe, he, Fanday and Noah met a few days later on August 16, 2006, to reconcile and discuss their options. They considered selling the equipment, breaking up the company, or going forward. Coe submitted into evidence notes from this meeting. Fanday and Coe had decided to go forward, and they created a list of duties for each of the men to complete for the business to become operational. However, according to Coe, the next day Fanday and Noah appeared at the warehouse telling Coe to leave because Coe's name was not on the lease. The police were called, and this is when Coe discovered the fraudulent lease that did not contain Coe's signature. At that point, the business was over, and Coe

lost his investment.

On Fanday's cross-examination of Coe, Coe admitted that he was not familiar with the regulatory requirements for the manufacturing facility. The men proceeded to argue about whether a secondary containment system was required, whether they even discussed the issue, and whether Coe refused to pay for it. The men then argued about whether their facility had sufficient water pressure to satisfy local fire codes. Coe then admitted that he had left California and the company for the entire month of July 2006. During that month, Fanday had called Coe asking him for a check to cover July rent. According to Fanday, the check bounced, but Coe could not recall if he even sent a check to Fanday or that it had bounced. Coe did admit, however, that he refused to pay rent for July and August, believing that Fanday should pay it. Ultimately, Noah loaned the men $5,600 to pay rent expenses for the months of July and August. Fanday and Coe then argued about whether another $60,000 was needed to complete the facility to satisfy U.S. Filter's first order. Coe also admitted that he was in possession of company property, but he denied having any of Fanday's clothing and other personal effects.

Fanday then gave his direct testimony. Fanday testified that while Coe was in New York for the month of July, he had asked Coe to come back and finish building the facility or they were going to lose the deal with U.S. Filter. According to Fanday, Coe stated that he did not care about losing his investment because he had money from selling his home. Fanday further testified that the men argued about the sufficiency of

- 11 -

the water supply and whether Coe would pay for Fanday's recommended plumbing system. In Fanday's opinion, Coe's idea of using a residential garden hose to fill two 1,500 gallon tanks for chemical blending was inadequate. At this point, Fanday believed Coe had no more money to invest, and he began looking for other investors like Noah. According to Fanday, the men needed another $60,000 for more tanks, raw chemicals, packing equipment, and operational cash for three to six months. Coe would not accept another partner or provide any needed cash. Without more cash, the business could not proceed. At that point, Fanday left. Fanday then took a job as a chemist with Wastech. Coe suspected that Fanday was using the Pellu formula at Wastech in violation of the injunction and called Wastech's Vice President, Paul,[5] and threatened him with litigation. In response, Paul arranged a meeting with Coe at Paul's attorney's office. Coe informed Paul that he owned the Pellu formula and that he had documentation to prove his ownership out in his car. Coe then allegedly went outside to get the documents and never returned. Coe objected to Fanday's testimony about this meeting as hearsay, which the bankruptcy court overruled. Fanday was eventually laid off from Wastech.

On Coe's cross-examination of Fanday, Fanday admitted he never told Coe that the lease Coe signed was not the final lease submitted to the landlord. Fanday further admitted that he asked Coe to leave because they were being evicted from the warehouse. However, Fanday had no documentation to prove the eviction, and

---

[5] We could not locate Paul's last name anywhere in the record.

he could not explain why they were being evicted when Noah had paid the July and August rent. After more discussion of that issue, the bankruptcy court reminded Coe that he had ten minutes left for cross-examination. Coe did not object to this time limit. For the remainder of Fanday's cross-examination, the men blamed each other for causing the business's demise and argued about who walked away first and why. After the ten minutes expired, the court allowed Coe to ask one more question. One question turned into many about Fanday's testimony at the § 341 creditor's meeting, which the court allowed. Fanday admitted he told the trustee that Coe was in possession of all information regarding the Pellu formula for Pellu Systems, Inc., and that he was a chemist at Wastech. Fanday further admitted that he had since patented the Pellu formula in the name of Pellu Systems Georgia because Coe had stolen the trade secret. Coe then attempted to ask Fanday whether he reported the patent on his Schedule B, but Fanday seemed confused by the question and the court directed Coe to move on. The men then began to discuss the value of the Pellu formula, but the court cut them off and directed them to present their closing arguments, for which they were allowed five minutes.

In his closing argument, Coe asserted that he had shown Fanday violated § 727 by concealing the Pellu formula - a valuable intangible asset - at both the § 341 creditor's meeting and in his Schedule B. Coe further asserted that he had met his burden of proof on his claims under § 523(a)(4) and (a)(6). In Fanday's closing argument, he denied receiving any money from licensing the Pellu formula.

Before making its oral ruling, the bankruptcy court admitted all of the exhibits submitted by both parties. As for the preclusive effect of the default judgment, the bankruptcy court determined that issue preclusion did not apply. First, the record was not clear as to whether Fanday was served with the summons and complaint. Second, the issue had not been necessarily decided because the judgment failed to state upon which grounds it found in favor of Coe - either breach of fiduciary duty or breach of contract.[6]

Although the court found that Fanday was a fiduciary to Coe as a matter of California law based upon the Agreement, Coe had failed to prove his debt was nondischargeable under either § 523(a)(4) or (a)(6), or that Fanday should be denied a discharge under § 727.

As for Coe's claims under § 523(a)(4) and (a)(6), the court found that Fanday had not abandoned the business and that no malicious injury had occurred; this was merely a business partnership that had gone sour. The men had drafted a very poor agreement that did not detail sufficiently who had responsibility for what aspects of the business. Based upon both men's testimony, it appeared the business was undercapitalized from the start; the total costs and business plan were never spelled out. From the beginning, significant disagreements occurred over how to run the business, including how much money Coe should contribute. When another partner was needed, the parties could

---

[6] Coe does not dispute the bankruptcy court's ruling on the preclusive effect of the default judgment. In any event, we see no error in that ruling.

- 14 -

not even agree on who had the greater technical expertise or who would provide the lead on regulatory requirements, whether or not Coe needed "jar" training, and what type of technical oversight such a highly regulated area would need. Further, no marketing plan existed setting forth what was required, who would implement it, and when. The two men could not agree on basic, essential items to run a business, which led to extreme mistrust and miscommunication. In short, both men were at fault for the business's demise. Both men wanted it their way, they could not reach an agreement, and so they were unable to move forward at that point. They both were trying to take advantage of the other. As for the alleged fraudulent lease, the court found that no proof existed showing the lease was in fact false, and Coe's belief that as a business owner his name should have been on the lease was "just an example of some of the ridiculous misunderstanding and false impressions [he] had with respect to this business." Trial Tr. (Aug. 3, 2009) 135:14-16.

As for Coe's § 727 claims, the bankruptcy court found that Fanday did not conceal assets or make false statements at the § 341 creditor's meeting or in his schedules. Since Coe was in possession of all of the company assets, no assets existed for Fanday to conceal.

Notably, the court found that both men were evasive in their testimony; they had selectively remembered facts and each left out critical facts in telling the sequence of events.

Although the court announced its ruling at the end of trial on August 3, 2009, it did not enter the judgment until April 27,

2010.  Coe timely appealed the judgment on June 3, 2010.[7]

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(J).  We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1.  Did the bankruptcy court err by not ruling on Coe's demurrer to Fanday's answer?

2.  Did the bankruptcy court abuse its discretion when it allowed Coe fifteen minutes for cross-examination?

3.  Did the bankruptcy court err when it entered judgment in favor of Fanday on Coe's claims under § 523(a)(4) and (a)(6)?

4.  Did the bankruptcy court err when it entered judgment in

---

[7] Since the judgment was entered on April 27, 2010, any appeal had to be filed by May 11, 2010.  On May 21, 2010, which was 10 days after the appeal time had run, Coe filed a motion to extend time to file an appeal under Rule 8002(c).  Coe contended that he was not expecting the judgment to be entered at that time, and because he was out of town between late April and early May, he did not receive notice of the judgment until after the appeal time had expired.  Under Rule 8002(c)(2):

> A request to extend the time for filing a notice of appeal must be made by written motion filed before the time for filing a notice of appeal has expired, <u>except that such a motion filed not later than 21 days after the expiration of the time for filing a notice of appeal may be granted upon a showing of excusable neglect</u>.  An extension of time for filing a notice of appeal may not exceed 21 days from the expiration of the time for filing a notice of appeal otherwise prescribed by this rule or 14 days from the date of entry of the order granting the motion, whichever is later (emphasis added).

On May 26, 2010, the bankruptcy court entered an order granting Coe a 14-day extension.  The court determined that the long delay between the completion of the trial and entry of the judgment constituted excusable neglect.  Therefore, Coe's motion was timely because it had been filed in less than 21 days after May 11, 2010.  According to the May 26 order, Coe had until June 9, 2010, to file his notice of appeal.

- 16 -

favor of Fanday on Coe's claims under § 727(a)(4)(A) and (D)?[8]

## IV. STANDARDS OF REVIEW

In discharge appeals, the Panel reviews the bankruptcy court's findings of fact for clear error and conclusions of law de novo, and applies de novo review to "mixed questions" of law and fact that require consideration of legal concepts and the exercise of judgment about the values that animate the legal principles. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009). A court's factual finding is clearly erroneous if it is illogical, implausible, or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010)(citing United States v. Hinkson, 585 F.3d 1247,

_____

[8] Coe also appeals the bankruptcy court's decision on the garnishment issue. On August 15, 2008, Fanday moved for return of garnished checks being held by the L.A. County Sheriff's Department in favor of Coe. After a hearing on September 17, 2008, the court ordered that the garnished checks in the amount of $1,014.60 be returned to Fanday ("Return Order"). On October 15, 2008, Coe moved to reconsider the Return Order, contending that he did not receive proper notice of the garnishment hearing. The court heard Coe's motion on November 19, 2008, and entered an order on November 24, 2008, vacating the Return Order due to improper service on Coe. The November 24 order further stated that a new hearing on the propriety of the garnishment matter would be heard on December 10, 2008.

At the December 10 hearing, the court decided that Coe's filing of the adversary complaint against Fanday had resolved the garnishment issue. If Fanday had improperly obtained the garnished wages from the Sheriff prior to the November 24 order vacating the Return Order, Coe was to take that up with the Sheriff. The bankruptcy court entered an order denying Coe's motion to reconsider on December 12, 2008.

We believe the order from December 12, 2008, was a final order, which had to be appealed by December 22, 2008 (under the former Rule 8002). If so, then Coe's appeal of that issue is untimely, and we lack jurisdiction over it. Even if we have jurisdiction, any prepetition garnishment was likely a recoverable preference under § 547 in any event (and not Coe's to keep), and any postpetition garnishment would have been stayed under § 362. Therefore, we are unable to grant Coe any effective relief even if his appeal is timely.

- 17 -

1261-62 & n.21 (9th Cir. 2009)(en banc)).  Even if two views of the evidence are possible, "the trial judge's choice between them cannot be clearly erroneous."  Beauchamp v. Hoose (In re Beauchamp), 236 B.R. 727, 729-30 (9th Cir. BAP 1999).

The bankruptcy court's decision to grant a Rule 15(b) motion is reviewed for an abuse of discretion.  Galindo v. Stoody Co., 793 F.2d 1502, 1512-13 (9th Cir. 1986).  We also review the bankruptcy court's decisions regarding management of litigation for an abuse of discretion.  FTC v. Enforma Natural Prods., 362 F.3d 1204, 1212 (9th Cir. 2004).  To determine whether the bankruptcy court abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether the bankruptcy court "identified the correct legal rule to apply to the relief requested" and (2) if it did, whether the bankruptcy court's application of the legal standard was illogical, implausible or "without support in inferences that may be drawn from the facts in the record."  Hinkson, 585 F.3d at 1261-62.

## V. DISCUSSION

Coe raises numerous issues on appeal.  For the most part, Coe disputes the bankruptcy court's findings of fact.  Significantly, the bankruptcy court explicitly found as a threshold matter that both Coe and Fanday were evasive in their testimony, selectively remembered facts, and left out critical facts in testifying as to the sequence of events.  When findings are based, as in this case, on determinations regarding the credibility of witnesses, we give even greater deference to the bankruptcy court's findings.  Hansen v. Moore (In re Hansen), 368 B.R. 868, 874-75 (9th Cir. BAP 2007).  This greater deference

- 18 -

is applied because the bankruptcy court, as the trier of fact, had the opportunity to note "variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575 (1985). With this in mind, we now review the issues on appeal.

**A. The bankruptcy court did not err when it did not rule on Coe's demurrer; Fanday's defenses at trial were allowed under FRCP 15(b).**

Coe argues that the bankruptcy court's failure to rule on his demurrer[9] before trial improperly allowed Fanday to raise defenses at trial that he had failed to raise in his answer, and Coe was particularly prejudiced when Fanday was allowed to testify about the business's need for $60,000. Coe further argues that Fanday's defenses were waived under FRCP 12(h)(1)(B)(ii). We disagree.

First of all, FRCP 12(h)(1)(B)(ii),[10] as incorporated by Rule 7012, does not apply here because Fanday never asserted the FRCP 12(b) defenses of: lack of personal jurisdiction, improper venue, insufficient process, or insufficient service of process. Second, in reviewing the bankruptcy court docket, the absence of a proof of service indicates that Fanday was never served with the demurrer. Coe also failed to file a notice of the motion or set the matter for hearing as required under Local Rule 9013-1.

---

[9] A "demurrer" does not exist in Federal litigation but is the California equivalent to a motion to dismiss for failure to state a claim under FRCP 12(b)(6). Tucker v. Interscope Records, Inc., 515 F.3d 1019, 1033 n.14 (9th Cir. 2008).

[10] FRCP 12(h)(1)(B)(ii) provides that a party waives any defense listed in FRCP 12(b)(2)-(5) by failing to include it in a responsive pleading or in an amendment allowed by FRCP 15(a)(1).

Moreover, Coe never raised the demurrer issue during the two days of trial. Nothing in the record indicates that the bankruptcy court even knew about Coe's demurrer. As such, the court could not have erred for failing to rule on it.

Admittedly, Fanday's answer is woefully inadequate. So is Coe's complaint. Generally, allegations not denied in the answer are deemed admitted under FRCP 8(b)(6). However, Fanday's answer requesting that the bankruptcy court dismiss Coe's complaint could be construed as a general denial of all of Coe's allegations. Even if not, once the trial had been conducted, FRCP 15(b) permitted amending the pleadings to conform to the evidence. Yadidi v. Herzlich (In re Yadidi), 274 B.R. 843, 851 (9th Cir. BAP 2002).

FRCP 15(b), as incorporated by Rule 7015(b), provides:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move - at any time, even after judgment - to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

When facts probative of claims actually alleged in the pleadings come into evidence at trial without objection, the factual issues are tried by implied consent of the parties. In re Yadidi, 274 B.R. at 851-52. Under FRCP 15(b), such factual issues are required to be treated in all respects as if they had been raised in the pleadings. Id. at 852 (citing Campbell v. Trs. of Leland Stanford Jr. Univ., 817 F.2d 499, 506 (9th Cir. 1987)).

Despite Fanday's inarticulate answer, Coe questioned Fanday at trial about why he left the business. In Coe's cross-examination of Fanday and, more importantly, during Fanday's

direct examination, Coe never objected to Fanday's testimony regarding the $60,000, which Fanday raised on several occasions.

Although neither party moved to amend the pleadings under FRCP 15(b), the lack of a motion does not change the outcome. "[FRCP] 15(b) is designed to be automatic and is not waived by omission to make a timely motion. The key question is whether there has been the requisite consent of the parties. If the court enters judgment on an issue litigated by consent without the pleadings having been formally amended, the lack of amendment does not matter." Id. at 851.

Accordingly, the bankruptcy court did not err by not ruling on Coe's demurrer, and it did not abuse its discretion by amending the pleadings to conform to the evidence submitted at trial.

**B. The bankruptcy court did not abuse its discretion when it allowed Coe fifteen minutes for cross-examination.**

Coe contends that the bankruptcy court violated Coe's due process rights by giving him only fifteen minutes to cross-examine Fanday, which was insufficient to prove his case. Coe further contends the court erred by not allowing re-direct and re-cross examination. We reject Coe's arguments.

The bankruptcy court did not err by not allowing re-cross examination because Coe never requested it. As for his other argument, Coe cites no authority (other than the Fourteenth Amendment of the U.S. Constitution) to support his contention that the fifteen minute time limitation imposed on his cross-examination of Fanday was an abuse of discretion. Generally, a district court may impose reasonable time limits on a trial.

- 21 -

Gen. Signal Corp. v. MCI Telecomms., 66 F.3d 1500, 1508 (9th Cir. 1995). We are not persuaded that fifteen minutes in this case was unreasonable.

Coe had approximately two days to present his case. He never objected to this time limit. On both days, each of the men were allowed to testify, virtually uninterrupted, for a significant period of time. As plaintiff, with the burden of proof, Coe was given even more time than Fanday. The bankruptcy court regularly kept both sides informed of the time remaining throughout the trial. After Coe had been cross-examining Fanday for some time, the bankruptcy court announced that Coe had 10 more minutes on cross. Coe did not object, but responded, "Oh, okay." Trial Tr. (Aug. 3, 2009) 106:9. It was up to Coe to use his time wisely. When the 10 minutes expired, the court allowed time for one more question. Nonetheless, the court allowed Coe to ask several more questions before he was finally instructed to stop.

By ensuring that Coe had time to conduct cross-examination of Fanday, even if limited to what Coe claims was fifteen minutes, the bankruptcy court satisfied the requirements of due process. See Harries v. United States, 350 F.2d 231, 236 (9th Cir. 1965)(a limitation on cross-examination denies due process only if it is "so severe as to constitute a denial" of the right to cross-examine). As such, we see no abuse of discretion.

**C. The bankruptcy court did not err when it entered judgment in favor of Fanday on Coe's claims under § 523(a)(4) and (a)(6).**

**1. Coe's claim under § 523(a)(4).**

Section 523(a)(4) provides that "a discharge under section

- 22 -

727 . . . of this title does not discharge an individual debtor from any debt - . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Whether a relationship is a fiduciary one within the meaning of § 523(a)(4) is a question of federal law. In re Weinberg, 410 B.R. at 28 (citing Ragsdale v. Haller, 780 F.2d 794, 795 (9th Cir. 1986)). However, we rely in part on state law to ascertain whether the requisite trust relationship exists. Cal-Micro, Inc. v. Cantrell (In re Cantrell), 329 F.3d 1119, 1124 (9th Cir. 2003). In the dischargeability context, the fiduciary relationship must arise from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt. In re Weinberg, 410 B.R. at 28.

The bankruptcy court found that Fanday was a fiduciary to Coe under California law based upon the provisions of the Agreement. Fanday does not dispute this finding on appeal, and we offer no opinion on the matter. Nonetheless, whether or not Fanday was a fiduciary to Coe, Coe failed to offer any evidence to support defalcation under § 523(a)(4).

"Defalcation" occurs when a fiduciary misappropriates or fails to account for trust funds or money held in a fiduciary capacity. Id. (citing Lewis v. Scott (In re Lewis)), 97 F.3d 1182, 1186 (9th Cir. 1996). See Woodworking Enters., Inc. v. Baird (In re Baird), 114 B.R. 198, 204 (9th Cir. BAP 1990)("In the context of § 523(a)(4), the term 'defalcation' includes innocent, as well as intentional or negligent defaults so as to reach the conduct of all fiduciaries who were short in their accounts."). None of Fanday's conduct constitutes a defalcation

- 23 -

for purposes of § 523(a)(4). Even assuming Fanday was in a fiduciary relationship with Coe, Coe never alleged, or proved at trial, that Fanday held funds in trust and/or that Fanday misappropriated or failed to account for any funds. Thus, Fanday could not have committed defalcation, and Coe's claim under § 523(a)(4) fails. We reject Coe's argument that the bankruptcy court erred when it concluded Coe lacked the necessary funds to go forward with the business, so therefore Fanday did not commit defalcation. How much money Coe had or did not have to invest has no bearing on whether Fanday committed defalcation.

We conclude, on this record, that the bankruptcy court did not err when it found in favor of Fanday on Coe's claim for a defalcation under § 523(a)(4).[11]

**2.    Coe's claim under § 523(a)(6).**

Section 523(a)(6) excepts from discharge debts resulting from willful and malicious injury by the debtor to another entity or to the property of another entity. Thus, by a preponderance of the evidence, the creditor must prove that the debtor's conduct in causing the claimant's injuries was both willful and malicious. <u>Carrillo v. Su (In re Su)</u>, 290 F.3d 1140, 1146-47 (9th Cir. 2002).

"Willfulness" requires proof that the debtor deliberately or

---

[11] On appeal, Coe contends that Fanday failed to account for funds he received when he sold some scaffolding that had been given to Pellu Systems, Inc. by U.S. Filter. This question of fact, which is not supported by any evidence in the record, was never raised before the bankruptcy court. We generally do not consider an issue raised for the first time on appeal, where the trial court had no opportunity to consider it. <u>El Paso v. Am. W. Airlines, Inc. (In re Am. W. Airlines, Inc.)</u>, 217 F.3d 1161, 1165 (9th Cir. 2000).

intentionally injured the creditor, and that in doing so, the debtor intended the consequences of his act, not just the act itself. <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 60-61 (1998). For a "malicious injury" to occur, the creditor must prove that the debtor: (1) committed a wrongful act; (2) done intentionally; (3) which necessarily causes injury; and (4) was done without just cause or excuse. <u>Carrillo v. Su (In re Su)</u>, 290 F.3d 1140, 1146-47 (9th Cir. 2002).

Based on our review of the evidence presented, Coe does not have a claim under § 523(a)(6). We agree with the bankruptcy court's finding that this was nothing more than a business partnership that had gone sour. Both men were at fault for the business's demise. They had no real plan, no real concept of what was required for a business of this magnitude, and could not seem to agree on anything. Police were called on numerous occasions for disturbances at the warehouse. After a few months, it was clear that these two men could not work together. Even if Fanday's actions were wrongful, intentional, and caused Coe injury, Fanday had just cause to leave the business. However, no evidence suggests that Fanday intended maliciously to injure Coe. The willfulness element is also lacking.

As for the lease issue, the bankruptcy court specifically found that no fraudulent lease existed. However, even if Fanday presented police with a fraudulent lease, Coe suffered no cognizable injury from that act; he was not removed from the warehouse. We also reject Coe's contention that the bankruptcy court erred in ruling that the Agreement itself was the reason the business failed. The men's poorly drafted business agreement

- 25 -

was just one of many facts the court determined caused the business's demise. Finally, we reject Coe's argument that the bankruptcy court improperly allowed Fanday's hearsay testimony about what "Paul said" when Fanday was not at the meeting with Coe, Paul, and Paul's attorney. Such testimony was irrelevant because what occurred or did not occur between Coe and Paul at that meeting has no bearing on Fanday's conduct, which is at issue here.

To the extent Coe contends that he suffered post-judgment damages[12] due to Fanday's willful violation of the injunction by wrongfully using the Pellu formula at Wastech, Coe failed to present evidence of any such damages before the bankruptcy court. Further, even assuming Fanday has violated the injunction, the "intent" element is lacking. Nothing in the record supports Coe's contention that Fanday's continued use of the Pellu formula was done with the specific intent to injure Coe.

Therefore, we conclude that the record amply supports the bankruptcy court's decision to find in favor of Fanday on Coe's claim under § 523(a)(6).

**D. The bankruptcy court did not err when it entered judgment in favor of Fanday on Coe's claims under § 727(a)(4)(A) and (D).**

Section 727 is to be construed liberally in favor of debtors

---

[12] As Coe informed the bankruptcy court at trial, his damages of $371,747.89 in the default judgment included Coe's lost investment, moving expenses, estimated lost profits of U.S. Filter for one year, and interest. The judgment did not include, and could not have included, damages for Fanday's subsequent alleged violation of the injunction. Thus, any damages Coe incurred as a result of that alleged conduct had to be pled in his adversary complaint and proven at trial. Coe admitted at oral argument that he failed to quantify any such damages before the bankruptcy court.

and strictly against the creditor. <u>First Beverly Bank v. Adeeb (In re Adeeb)</u>, 787 F.2d 1339, 1342 (9th Cir. 1986). The burden is on the party opposing discharge to prove by a preponderance of the evidence that discharge should be denied. <u>Grogan v. Garner</u>, 498 U.S. 279, 289 (1991).

**1.    Coe's claims under § 727(a)(4)(A) and (D).**

**a.    Elements of § 727(a)(4)(A) and (D).**

Section 727(a)(4)(A) provides that a court should grant a discharge to a debtor, unless the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account. To deny a debtor a discharge under § 727(a)(4)(A) based on a false oath, the plaintiff must show: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." <u>Roberts v. Erhard (In re Erhard)</u>, 331 B.R. 876, 882 (9th Cir. BAP 2005). "A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath." <u>Khalil v. Developers Sur. & Indem. Co. (In re Khalil)</u>, 379 B.R. 163, 172 (9th Cir. BAP 2007). A finding of fraudulent intent (or lack thereof) is a finding of fact reviewed for clear error. <u>Adeeb</u>, 787 F.2d at 1342.

Section 727(a)(4)(D) supports the denial of discharge when the debtor knowingly and fraudulently withheld from an officer of the estate any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

- 27 -

**b.    Disposition of the issues.**

For his claim under § 727(a)(4)(A), Coe alleged that Fanday made a false oath in his bankruptcy schedules by failing to disclose his intellectual property asset of a water treatment formula. Coe further alleged that Fanday made a similar false oath at the § 341 creditor's meeting by stating that he did not own any intellectual property regarding a water treatment formula. For his claim under § 727(a)(4)(D), Coe alleged that Fanday withheld "documentation of his assets in his bankruptcy schedules." Since Coe did not allege, or prove at trial, that Fanday failed to produce any particular financial documents to the trustee, his only claim at issue is whether Fanday made a false oath or omission in his bankruptcy schedules in violation of § 727(a)(4)(A).

The bankruptcy court found that Fanday did not conceal assets or make false statements at the § 341 creditor's meeting or in his schedules. Specifically, the court found that Fanday could not conceal any assets when they were all left admittedly in Coe's possession.

Coe contends that the bankruptcy court erred when it determined that Fanday did not make false oaths in his schedules or at the § 341 creditor's meeting about not owning the Pellu formula because the manifest weight of evidence showed otherwise: i.e., Fanday used the formula to blend chemicals for the U.S. Air Force for years before partnering with Coe; Fanday admitted that the formula was valuable; Fanday has continued to profit from the formula at Wastech; and Fanday has since patented the formula in 2009.

At the § 341 creditor's meeting, Fanday stated that he was not in possession of any intellectual property related to Pellu Systems, Inc. Fanday further testified that Coe had stolen, and was still in possession of, the intellectual property associated with the Pellu formula, including Fanday's computer that contained work he did for the U.S. Air Force. When Coe asked Fanday whether he had licensed or allowed anyone else to use the Pellu formula, Fanday responded "no." When the trustee followed up with the same question regarding licensing of the Pellu formula, or any other formula Fanday invented, Fanday responded that he had no such licensing agreement.

Contrary to Coe's assertion, in reviewing the § 341 creditor's meeting transcript Fanday never stated that he did not "own" the Pellu formula or any other wastewater treatment formulas. Fanday was only asked whether he was in possession of any intellectual property related to Pellu Systems, Inc., and whether he had any licensing agreement regarding the Pellu formula or any other formula he invented. The bankruptcy court correctly found that Coe admitted he was in possession of nearly all of Pellu Systems, Inc.'s property. Fanday further stated he was not receiving any money from licensing agreements for any wastewater treatment formulas he invented, including the Pellu formula. Coe failed to produce any evidence of a licensing agreement.

As for not reporting the Pellu formula in his Schedule B, the record is unclear whether the formula is owned by Pellu Systems Georgia, Pellu Systems, Inc., or Fanday himself. At one point, Coe had asserted to Paul at Wastech that he owned the

- 29 -

formula. Without establishing that Fanday owns the Pellu formula, Coe could not prove that Fanday made a false oath in not reporting it. Thus, the bankruptcy court did not clearly err in finding that Fanday made no false oath in his Schedule B.

Accordingly, we see no error in the bankruptcy court's decision to find in favor of Fanday on Coe's claims under § 727(a)(4)(A) and (D).[13]

## VI. CONCLUSION

Based on the foregoing reasons, we AFFIRM.

---

[13] The bankruptcy court articulated findings on Coe's claims under § 727(a)(4)(A) and (D). However, Coe also asserted claims under § 727(a)(2) and (a)(3). Coe does not assign any error by the bankruptcy court for not ruling on these additional claims, or raise this issue on appeal. Nonetheless, to the extent the court did not articulate findings on these additional claims, we AFFIRM. See Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295 (9th Cir. 1998)(we may affirm on any basis found in the record).
Coe's allegation that Fanday's use of a fictitious address for Coe to prevent Coe from attending the § 341 creditor's meeting does not support a claim under either § 727(a)(2)(A) or (B). In any event, Coe attended the meeting and questioned Fanday. As for his claim under § 727(a)(3), Coe's mere allegation that Fanday "conceal[ed] documentation of his assets" is clearly insufficient to establish a prima facie case. Furthermore, no evidence at trial established that Fanday had concealed any documents that related to his financial condition or business transactions. In fact, Coe admitted that he was in possession of Fanday's computer, which Fanday testified held all of his business records.