IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| IN RE FUNKO, INC. SECURITIES LITIGATION. | No. 81811-2-I |
|---|---|
| | DIVISION ONE |
| | UNPUBLISHED OPINION |

ANDRUS, A.C.J. — Investors purchasing Funko, Inc. securities during a 2017 initial public offering (IPO) sued Funko, its officers and directors, the IPO underwriters, and allegedly controlling venture capital firms for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.[1]  They now appeal the dismissal of their claims under CR 12(b)(6), arguing they adequately allege material omissions and misstatements in Funko's registration statement and prospectus.  We affirm in part, reverse in substantial part and remand for further proceedings.

FACTUAL BACKGROUND

Founded in 1998 in Everett, Washington, Funko designs, creates, and distributes collectible products depicting characters and icons from movies, television shows, video games, sports teams, and other pop culture celebrities.  On October 6, 2017, Funko filed a registration statement with the Securities

---

[1] 15 U.S.C. § 77a *et seq.*

Exchange Commission (SEC) in anticipation of the IPO.  On November 3, 2017, the company filed a prospectus, which incorporated and formed part of the registration statement (collectively referred to here as "the registration statement"). Funko used the registration statement to sell approximately 10.4 million shares of Class A common stock in the IPO.

The registration statement described Funko, its products and customers, its business model and strategies for mitigating market risk, historical financial data for Funko and its predecessor, Funko Acquisition Holdings, LLC (FAH), between January 2015 and June 2017, and its estimated revenue for the three months ending September 30, 2017.

The SEC declared Funko's registration filing effective on November 1, 2017. Funko common stock began trading at a price of $12 per share on November 2. That same day, Bloomberg Gadfly, an online business blog, posted an article written by financial journalist Stephen Gandel, which criticized Funko's registration statement for misstating its earnings.  Gandel wrote:

> In Funko's IPO prospectus, in a chart with a big arrow pointing up, the company says that an important measure of its income, which it uses to determine the success of its operational strategies, rose by an average of 86 percent in its past two full years.  The actual bottom line, though, was up an average of just 16 percent in 2015 and 2016 and has turned negative lately.  Funko lost just more than $10 million in the first half of this year.  How the toymaker gets a loss of $10 million to reflect back as an 86 percent earnings increase is the latest example of fun-house accounting on Wall Street.

At the close of trading that day, the price of Funko stock dropped to $7.07, described by the Seattle Times as "the worst first-day return for an IPO in 17 years."[2]

Several IPO investors (Investors) filed this lawsuit on November 16, 2017. Multiple additional lawsuits followed, all of which were consolidated in the trial court. The Investors claimed they purchased Funko stock sold in or traceable to the offering, and that Funko, certain Funko officers and directors,[3] the IPO underwriters,[4] and allegedly controlling venture capital firms[5] violated Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 by making materially false or misleading statements in the registration statement.

The Investors initially alleged that the registration statement made false and misleading statements regarding the company's financial growth in the years before the IPO, based on the Gandel article, and failed to disclose that this growth was due in large part to Funko's reliance on the intellectual property of third-party content providers.

Funko, the Underwriters, and the Venture Capital Firms moved to dismiss the Investors' claims under CR 12(b)(6). Funko argued it made no materially false

---

[2] Seattle Times Staff, Funko stock plunges in 'worst first-day return for an IPO in 17 years', THE SEATTLE TIMES, https://www.seattletimes.com/business/funko-stock-plunges-in-ipo-shocker/.

[3] The named officers and directors were Brian Mariotti, Russell Nickel, Ken Brotman, Gino Dellomo, Adam Kriger, Richard McNally, Charles Denson, and Diane Irvine. Funko and its officers and directors will be referred to collectively as "Funko."

[4] The named underwriters were Goldman Sachs & Co.; LLC, J.P. Morgan Securities LLC; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Piper Jaffray & Co.; Jeffries LLC; Stifel Nicolaus & Co.; BMO Capital Markets Corp.; and SunTrust Robinson Humphrey, Inc. These named defendants will be referred to hereafter as "the Underwriters."

[5] The named venture capital firms were Fundamental Capital Partners, LLC, Fundamental Capital Partners, LLC, and ACON Investments, LLC. These named defendants will be referred to hereafter as "the Venture Capital Firms."

or misleading statements in the registration statement and that some of the statements on which the Investors relied were inactionable opinions or puffery. The Venture Capital Firms also argued that they could not be held liable under Section 15 of the Securities Act because they did not in fact exercise any power or control over Funko.

In an order dated August 2, 2019, the court dismissed the Investors' Section 11 and 12(a) claims without prejudice. The court found that the registration statement did not contain any materially false or misleading financial disclosures. The court further found that the Gandel article did not question the accuracy of Funko's disclosures and was therefore not a "corrective disclosure" revealing any falsity in the registration statement. To the extent that the Investors challenged allegedly false and misleading opinions, rather than statements of fact, the court concluded that the Investors had not established that the opinions were misleading under the standard set forth in Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 135 S. Ct. 1318, 191 L. Ed. 2d 253 (2015). The court also dismissed without prejudice the Investors' Section 15 claim against the Venture Capital Firms, concluding that they could not be secondarily liable if Funko was not liable for any primary violations of the Securities Act.

Although the trial court concluded the Investors failed to state claims under the Securities Act, it allowed them to amend their complaint. The Investors filed an amended complaint on October 3, 2019, adding specific allegations that Funko's financial disclosures were misleading because Funko failed to disclose it had abandoned a $1.4 million e-commerce platform, had engaged in "channel

stuffing" to artificially inflate its revenue in the months preceding the IPO, failed to disclose that it lacked the ability to track and record the value of obsolete inventory, and made false statements about the value of its intellectual property.

Funko, the Underwriters, and the Venture Capital Firms again moved to dismiss the amended claims, making the same arguments as in their initial CR 12(b)(6) motions. The trial court again dismissed the lawsuit, this time with prejudice. The Investors appeal.

ANALYSIS

The Securities Act of 1933 protects investors by ensuring that companies issuing securities make a "full and fair disclosure of information" relevant to a public offering. Pinter v. Dahl, 486 U.S. 622, 646, 108 S. Ct. 2063, 100 L. Ed. 2d 658 (1988). "The linchpin of the Act is its registration requirement." Omnicare, 575 U.S. at 178. In general, an issuer may offer securities to the public only after filing a registration statement. See 15 U.S.C. §§ 77d, 77e. A registration statement must contain specific information about both the company and the security for sale. See 15 U.S.C. §§ 77g, 77aa. "Section 11 of the Act promotes compliance with these disclosure provisions by giving purchasers a right of action against an issuer or designated individuals . . . for material misstatements or omissions in registration statements." Omnicare, 575 U.S. at 179.

Section 11 of the Securities Act provides:

> In case any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may, either at law or in equity, in any court of competent jurisdiction, sue.

15 U.S.C. § 77k(a). To prevail on a claim under Section 11, a plaintiff must prove (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, meaning that it would have mislead a reasonable investor about the nature of their investment. Rubke v. Capitol Bancorp Ltd., 551 F.3d 1156, 1161 (9th Cir. 2009). No scienter is required for liability under Section 11; a defendant can be liable for innocent or negligent material misstatements or omissions. In re Daou Sys., Inc., 411 F.3d 1006, 1027 (9th Cir. 2005).

> Section 12(a)(2) of the Securities Act imposes civil liability on
>
> [a]ny person who . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . .

15 U.S.C. § 77l(a)(2). To prevail under Section 12(a)(2), a plaintiff must demonstrate (1) an offer or sale of a security, (2) by the use of a means or instrumentality of interstate commerce, (3) by means of a prospectus or oral communication, (4) that includes an untrue statement of material fact or omits to state a material fact that is necessary to make the statements not misleading by any person. Miller v. Thane Int'l, 615 F.3d 1095, 1099 (9th Cir. 2010).

For a misstatement to be actionable under Section 11 or 12, it must be both false and material. In re Restoration Robotics, Inc. Sec. Litig., 417 F. Supp. 3d 1242, 1254 (N.D. Cal. 2019) (citing Basic Inc. v. Levinson, 485 U.S. 224, 238, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)). For a statement to be misleading, it must

affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists. Id. (quoting Brody v. Transitional Hosp. Corp., 280 F.3d 997, 1006 (9th Cir. 2002)). Materiality is fact-specific and turns on context. Id. at 1257. Statements in a prospectus must be read in the context of the whole document and be judged based on the facts as they existed when the applicable registration statement became effective. Id. The issue is not whether the statements, taken separately, are literally true; the issue is whether the statements, taken in context, would have misled a reasonable investor about the nature of the investment. Id. at 1258.

Although the Investors' claims arise under federal law, we apply state rules of civil procedure to test the sufficiency of the Investors' allegations at the CR 12(b)(6) stage. Dismissal is warranted under CR 12(b)(6) only if it appears beyond doubt that the plaintiff can prove no set of facts consistent with the complaint that would entitle him or her to relief. Leishman v. Ogden Murphy Wallace, PLLC, 196 Wn.2d 898, 903-04, 479 P.3d 688 (2021). All facts alleged in the complaint are taken as true and "a court may consider hypothetical facts not part of the formal record in deciding whether to dismiss a complaint pursuant to CR 12(b)(6)." Haberman v. Wash. Pub. Power Supply Sys., 109 Wn.2d 107, 120, 744 P.2d 1032 (1987) (citations omitted). Under CR 12(b)(6), a plaintiff must merely demonstrate that it is possible that facts could be established to support allegations in a complaint. McCurry v. Chevy Chase Bank, FSB, 169 Wn.2d 96, 101, 233 P.3d 861 (2010). We review CR 12(b)(6) dismissals de novo. FutureSelect Portfolio

Mgmt., Inc. v. Tremont Group Holdings, Inc., 180 Wn.2d 954, 962, 331 P.3d 29 (2014).

Although the Investors alleged multiple false or misleading statements in the amended complaint, they focus on only five categories of statements on appeal. We address each category of statements in turn.

Statements of Net Revenue

The Investors first claim that Funko's registration statement included materially false and misleading statements of net revenue for the first three quarters of 2017. They allege that the reported revenue was misleading because Funko failed to disclose that it "was capitalizing an abandoned e-commerce project and over one million dollars in expenditures that should have been entirely written off the bottom line." They contend that Funko had a duty to disclose the fact that the asset was valueless. Under Generally Accepted Accounting Principles (GAAP), when a long-lived asset ceases to be used, the carrying amount of the asset should equal its salvage value, if any. Accounting Standards Codification (ASC) 360-10-35-47.[6] The Investors allege that had Funko written off these expenses, as required by GAAP, the company's reported net income for the first six months of 2017 would have reflected a net loss and would have reduced estimated net income for the third quarter of 2017 by almost 20 percent.

Funko argues that its estimated net revenue for the third quarter of 2017 could not have been false or misleading because its actual sales, reported to the

---

[6] The ASC is the source of authority on the GAAP published by the Financial Accounting Standards Board. In re Perrigo Company PLC Securities Litigation, 435 F. Supp. 3d 571, 582 (S.D.N.Y. 2020).

SEC in December 2017, exceeded the prospectus estimates.[7]  But to state a claim under Section 11 of the Securities Act, a plaintiff need only plead that "any part of the registration statement, <u>when such part became effective</u>, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a) (emphasis added).  The Investors here did just that.  The Investors alleged that Funko omitted information from the 2017 financial statements and the missing information rendered the financial information contained in its registration statement misleading at the time the registration statement became effective.  That Funko later proved to outperform those estimates does not exclude the possibility that its failure to write off the value of the e-commerce platform was a material omission.  Nor is there any indication in the record that Funko's exceptional financial performance was due to its accurate treatment of the e-commerce platform in its financial disclosures.

Funko next contends that subjective "accounting judgments," such as whether Funko's financial statements complied with ASC standards, are nonactionble statements of opinion.  <u>Id.</u> at 20-21.  For this proposition, Funko cites to <u>In re Hertz Global Holdings, Inc.</u>, 2017 WL 1536223 (D. N.J. 2017).  In that case, the plaintiff investors alleged that Hertz's financial statements were false or

---

[7] Funko submitted SEC filings to support its argument that it made no materially false or misleading statements about its estimated third quarter 2017 sales revenue.  "Generally, in ruling on a CR 12(b)(6) motion to dismiss, the trial court may consider only the allegations contained in the complaint and may not go beyond the face of the pleadings.  <u>Rodriguez v. Loudeye Corp.</u>, 144 Wn. App. 709, 725, 189 P.3d 168 (2008).  But "the trial court may take judicial notice of public documents if their authenticity cannot be reasonably disputed in ruling on a motion to dismiss."  <u>Id.</u> at 725-26. In <u>Rodriguez</u>, this court held that SEC filings are properly subject to judicial notice at the CR 12(b)(6) stage.  144 Wn. App. at 728.  The Investors do not challenge the trial court's review of and reliance on these SEC filings.

misleading because they "were presented in violation of GAAP." Id. at *7. The federal court in that case concluded that because GAAP standards are often subjective, and involve "a range of possible treatments instead of a single objective set of calculations," a company's representation that its financial statements were GAAP-compliant was not a matter of objective fact. Id. at *11. The U.S. Supreme Court has recognized that GAAP does not present a "canonical set of rules," but rather tolerates a range of reasonable treatments left to the discretion of those preparing financial reports. See Thor Power Tool Co. v. Comm'r, 439 U.S. 522, 544, 99 S. Ct. 773, 58 L. Ed. 2d 785 (1979) (accountants have long recognized that "generally accepted accounting principles" will not ensure identical accounting treatment of identical transactions).

But there is a difference between alleging that a company engaged in improper accounting practices and alleging that a company simply applied a GAAP rule incorrectly. Fresno County Employees' Ret. Ass'n v. comScore, Inc., 268 F. Supp. 3d 526, 546 (S.D. N.Y. 2017) (distinguishing Hertz). And even if a company's statements about GAAP compliance are subjective opinions, they may still be actionable under the Securities Act. Id.

Although Sections 11 and 12 refer to misrepresentations and omissions of material fact, matters of opinion are not beyond the purview of these provisions. See Omnicare, 575 U.S. at 188-89. The Supreme Court in Omnicare established three different standards for pleading falsity of opinion statements. First, every statement of opinion explicitly affirms one fact: that the speaker actually holds the stated belief. Id. 184. Second, some statements of opinion contain embedded

statements of fact. Id. at 185. Third, a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view. Id. at 188. Such a statement could give rise to liability under an omission theory if the facts conveyed in that fashion are untrue. Golub v. Gigamon, Inc., 994 F.3d 1102, 1106 (9th Cir. 2021).

In this case, the Investors allege Funko knew it had invested over $1 million to develop a new e-commerce platform and knew by early 2017 that it did not work. They further allege that by July 2017, Funko realized it was not usable at all, abandoned the project, and returned to using an old e-commerce platform. Yet, the Investors allege Funko did not include these expenses in calculating its net income for any part of 2017. Given that the net income for all of 2017 was only $7.3 million, the Investors contend that an expenditure of $1.4 million for a failed e-commerce platform would have been material to any reasonable investor.[8] In other words, it is possible—based on the Investors' allegations—that Funko did not have a factual basis for the actual net revenues reported in the registration statement. We conclude that these allegations are sufficient to survive a CR 12(b)(6) motion to dismiss under the third prong of Omnicare.[9]

---

[8] Funko's financial statement revealed a net loss in the first six months of 2017 of $5.4 million. The Investors appear to allege that Funko should have reported an additional $1.4 million in losses in that six month period *or* in the three month period ending September 30, 2017.

[9] Funko argues that the Investors abandoned this claim on appeal because, although they included it in their assignments of error, they did not adequately address the issue in their brief. We disagree. In referring to the e-commerce platform, the Investors argue that "Funko did not write it off and failed to disclose the underlying fact that the platform was not functioning." The Investors further argue that "Funko's failure to disclose the write-off of this important asset along with other material inaccuracies in Funko's Registration Statement was information that would mislead investors." The Investors adequately raised the issue in their brief.

Funko disputes whether the ASC standard invoked by the Investors actually required it to write off the e-platform asset before it issued the registration statement. It suggests that Funko had not abandoned the asset as of July 2017. Id. But whether Funko knew before July 2017 that the asset had no value to the company and whether it should have written that asset off as a loss are questions of fact not properly addressed at the pleading stage. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1421 (3rd Cir. 1997) (whether company's earnings overstatement can be fully explained by the company's use of a different accounting method should not be resolved on a motion to dismiss). We reverse the dismissal of the Investors' Section 11 and 12 claims arising out of the allegedly failed e-commerce platform.

Channel Stuffing

Funko's registration statement contained several statements attributing Funko's "strong growth" in the years before the IPO to "strong licensing relationships with many established content providers," "a nimble and low-fixed cost production model," and a "dynamic business model." The Investors allege that these statements, as well as Funko's 2017 revenue figures, were false and misleading because the company's growth and revenue in the year prior to the IPO was driven, not by its production or business model, but by its practice of "channel stuffing."

"Channel stuffing is the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply." Steckman v. Hart Brewing,

Inc., 143 F.3d 1293, 1298 (9th Cir. 1998). The Supreme Court recognized that channel stuffing may be "the illegitimate kind (e.g., writing orders for products customers have not requested) or the legitimate kind (e.g., offering customers discounts as an incentive to buy)." Tellabs, Inc. v. Makor Issues & Rights., Ltd., 551 U.S. 308, 325, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). Courts have also recognized that there may be legitimate reasons to shift sales earlier in the cycle. For example, in Waterford Twp. Police v. Mattel, Inc., 321 F. Supp. 3d 1133, 1148 (C.D. Cal. 2018) and In re ICN Pharma, Inc. Sec. Litig., 299 F. Supp. 2d 1055, 1061-62 (C.D. Cal. 2004), federal courts recognized that when the demand for a company's products is seasonal, that company may choose to drive up sales during the high season to make up for lower sales later on. "Channel stuffing" is therefore not inherently improper and not always guaranteed to lower sales in the future. Yaron v. Intersect ENT, Inc., 2020 WL 6750568 at *6 (N.D. Cal. 2020).

But even legitimate channel stuffing may be part of a scheme to hide poor business fundamentals. Id. Because channel stuffing "borrows" from future demand, the underlying weakness will necessarily reveal itself in time. Id. Channel stuffing will support a Securities Act claim when a plaintiff alleges that the defendants knew the business was weak, falsely represented to investors that business was strong, and used channel stuffing to bolster their misrepresentations in the short-term. Id. Alternatively, channel stuffing that involves shipping unneeded or unordered products may also be actionable. Id. at *7.

A company's failure to disclose its reliance on channel stuffing may also form the basis of a claim under Section 12 if such nondisclosure violated former

17 C.F.R. § 229.303(a)(3)(ii),[10] known as Item 303 of Regulation S-K of the Securities Act. Steckman, 143 F.3d at 1296. Item 303 requires a company to

> [d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

To the extent the Investors allege that Funko made statements attributing its success to its "dynamic business model," rather than channel stuffing, we agree these allegations are insufficient, by themselves, to establish a Section 11 or 12 claim. An actionable statement must be "capable of objective verification." Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co., 845 F.3d 1268, 1275 (9th Cir. 2017). Statements that lack a standard against which a reasonable investor could expect them to be pegged are puffery. City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp., 47 F. Supp. 3d 1205, 1219-20 (E.D. Wash. 2014). As a result, business puffery or opinion (vague, optimistic statements) are not actionable because they do not induce the reliance of a reasonable investor.[11] Or. Pub. Emp. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 606 (9th Cir. 2014).

The Investors point to statements in the registration statement that "[w]e have developed a nimble and low-fixed cost production model," and "we can dynamically manage our business to balance current content releases and pop culture trends . . . ." Whether Funko is a "nimble" company or its management

---

[10] Now codified as 17 C.F.R. § 229.303(b)(2)(ii).
[11] "Puffing" concerns expressions of opinion, as opposed to knowingly false statements of fact. Or. Pub Emps. Ret. Fund, 774 F.3d at 606.

"dynamic" are statements not subject to objective verification. We agree with the trial court that such statements, by themselves, are puffery and not actionable. We therefore affirm the dismissal of any claim based on these statements alone.

But to the extent the Investors allege Funko failed to disclose its reliance on channel stuffing in violation of Item 303, the allegations are sufficient to pass CR 12(b)(6). To state a claim of a violation of Item 303, a plaintiff must allege facts showing that (1) management knew of a trend, demand, commitment, event or uncertainty (2) the trend, demand, commitment, event, or uncertainty was reasonably likely to have a material effect on the company's financial condition or results of its operations and (3) management did not disclose these facts in the offering statement. Steckman, 143 F.3d at 1296-97.

In paragraph 47 of the amended complaint, the Investors allege:

> The statements [in the registration statement] were materially false and misleading when made because . . . they failed to disclose:
> . . . .
>
>  (b) that the Company had overloaded its sales channels with excess inventory, including with its flagship Pop! collectibles line, as demand for the Company's products had slowed during the same quarter in which defendants had carried out the IPO, increasing the likelihood that Funko products would be sold at a discount or on clearance during the critical 2017 holiday shopping season.

They allege that Funko relied on channel stuffing to boost its sales revenue and did not disclose that this business model created a significant risk that retailers would return excess products to Funko or would have to sell excess products at deeply discounted prices. They further alleged that the company was aware it was experiencing adverse sales and earnings trends far below the reported 86% compound annual growth rate reported in the registration statement, from which a

- 15 -

trier of fact could infer knowledge. And they allege that in November 2017, just weeks after the IPO, market analysts reported that retailers had a significant amount of Funko's products on their shelves and were selling more items at clearance prices.

The overloading of inventory, per the Investors, damaged Funko's business. When securities analysts reported about slow sales at major retailers and the risk that demand would be satiated and the market saturated, Funko's stock price dropped from $9.85 per share to $8.67 per share. Subsequent reports identified this market saturation as a "warning sign," and downgraded the company. In late December 2017, the Investors allege, Funko's common stock closed at $6 per share, a 50 percent decline from the IPO stock price just two months earlier.

Funko contends that the Investors' Item 303 claim fails because the Investors failed to plead that Funko knew of the omitted trend or risk and that it reasonably expected the trend would have a material impact on revenue or income. We can easily dispose of these arguments because the allegations in the complaint are sufficient, particularly under the state CR 12(b)(6) standard, to allege this requisite knowledge.[12] The Investors allege that Funko had accounts receivable growing faster than the rate of its sales growth, that internal documents

---

[12] Funko cites multiple federal cases indicating that a Section 11 channel stuffing claim must be supported by specific factual allegations to survive a motion to dismiss for failure to state a claim. But these cases were dismissed under FRCP 12(b)(6) and involve claims brought under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), which requires a plaintiff to plead scienter and are thus inapposite here. See Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 712 (7th Cir. 2008); In re Cabletron Sys., Inc., 311 F.3d 11, (1st Cir. 2002); In re ICN Pharm., Inc. Sec. Litig., 299 F. Supp.2d 1055 (C.D. Cal. 2004); Sekuk Glob. Enters. v. KVH Indus., Inc., No. 04-cv-306, 2005 WL 1924202 (D.R.I. Aug. 11, 2005).

recognized that customers were taking longer to pay for the products Funko was delivering to them, and Funko was extending payment terms to these customers. They contend Funko knew that the average number of days it was taking to collect payment was increasing and the company recognized its inventory turnover had decreased by double digits. The Investors further allege that Funko engaged in channel stuffing for "at least the twelve months leading up to the IPO" and that this practice rendered Funko's stated growth strategies "impotent" and that its statements concerning the company's growth and revenue during that period were misleading because they were based on those undisclosed practices. They allege that all of these key metrics constitute evidence that management knew it was channel stuffing and that this practice would likely have a material impact on its sales revenue. These allegations adequately satisfy CR 12(b)(6)'s pleading standard.

Funko also argues the Investors' Item 303 claim fails because it is premised on financial information that it fully disclosed in the registration statement. Funko cites Dropbox Sec. Litig., No. 19-cv-06348, 2020 WL 6161502, at *8 (N.D. Cal. Oct. 21, 2020), to support its argument that a Section 11 claim is appropriately dismissed where "[a]nyone with basic mathematical skills" could discern the allegations from the disclosed information. First, we do not read the Investors' claim to be based exclusively on disclosed information. The Investors' complaint makes reference to "internally reported accounts receivable amounts," and "internal reports" indicating saturated sales channels. They thus allege that there

are records in Funko's possession that prove it stuffed sales channels with its products in the run up to the IPO.

Second, whether a reasonable investor could discern the possible presence of channel stuffing from Funko's financial statements is a question of fact that we will not decide on the pleadings under CR 12(b)(6).[13] See In re Control Data Corp. Sec. Litig., 933 F.2d 616, 621 (8th Cir. 1991) ("whether a misrepresentation would have the effect of defrauding the market and inflating the stock price is a jury question.") (citing TSC Indus. Inc. v. Northway, Inc., 426 U.S. 438, 450, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976).

We reverse the CR 12(b)(6) dismissal of the Investors' Item 303 claim based on the allegation that Funko failed to disclose its channel stuffing practices. We affirm the dismissal of the claim to the extent it is based on unverifiable descriptions of the company as "nimble" or its management "dynamic."

Inventory Control Practices

The Investors next contend the trial court erred in dismissing their claim that Funko failed to disclose that it lacked the ability to track obsolete inventory and included "dead stock" (outdated stock it could not sell) in its reported inventory figures in violation of GAAP standards.[14] The Funko consolidated balance sheet

---

[13] Funko also argues that the channel stuffing claim cannot survive because the company's performance after the IPO exceeded its estimates, making it impossible for any jury to conclude that it engaged in channel stuffing. But the Investors' channel stuffing claim does not fail as a matter of law at this stage simply because the company's revenues have grown in the years following the IPO. Although the company's post-IPO performance may undercut the Investors' claim of channel stuffing on summary judgment or at trial, it does not preclude the possibility that Funko inflated its sales numbers before the IPO, or that Funko continued to artificially inflate its revenue by engaging in channel stuffing following the IPO, as the Investors allege.

[14] The Investors rely on former ASC 330-10-35-1, which states:

valued its inventory at the end of 2016 at $43.6 million and at the end of 2017 at $79 million. The Investors allege that Funko had warehouses full of excess and outdated inventory that it was moving between warehouses and once moved, these items would vanish from the company tracking system. They allege Funko did not write down the value of this dead stock, resulting in an overstatement of the value of its inventory.

We conclude that the allegation that Funko overstated the value of its inventory in its financial statements is sufficient to state a Section 11 and 12(a) claim under CR 12(b)(6).[15]

Funko argues that the valuation of its inventory is an accounting judgment and thus a nonactionable statement of opinion under Omnicare. The consolidated balance sheets did explain how the company valued its inventory:

> Inventory consists primarily of figures, plush, accessories and other finished goods, and is accounted for using the first-in, first-out ("FIFO") method. The Company maintains reserves for excess and obsolete inventories to reflect the inventory balance at the lower of cost or net realizable value. This valuation requires us to make judgments, based on currently available information, about the likely method of disposition, such as through sales to customers, or liquidation, and expected recoverable value of each disposition category. The Company estimates obsolescence based on assumptions regarding future demand. Inventory costs include direct product costs and freight costs.

---

A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as their cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference shall be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market.

[15] The Investors also alleged that Funko's statements regarding its inventory management practices were rendered misleading by the fact that the company did not have an effective inventory management system. Because the Investors failed to identify an affirmative misstatement or omission, this allegation was appropriately dismissed.

But the Investors allege that Funko lacked a functional inventory tracking system and that "internal reports at the Company as of the IPO indicated that Funko's inventory included significant amounts of obsolete merchandise." If true, Funko was aware of undisclosed facts undermining the reported valuation it placed on its inventory and this awareness is sufficient to establish falsity of an opinion statement at the pleading stage under Omnicare.

Value of Intellectual Property

The Investors next claim the Funko registration statement "materially overstated the value of its intangible assets, including its intellectual property." According to these documents, as of December 31, 2016, Funko reported $243 million in net intangible assets, including $107 million in intellectual property. The Investors allege these figures were misleading because Funko failed to disclose the fact that its intellectual property valuation included the value of the items already deemed unsaleable by the company. We conclude the Investors have satisfied the CR 12(b)(6) pleading standard as to this claim.

Funko first contends we should not reach the issue because the trial court found that Funko adequately disclosed that it licenses all of its intellectual property from third parties and the Investors failed to assign error to this finding. But our review is de novo so any trial court "findings" on CR 12(b)(6) are immaterial to our analysis. See Deegan v. Windermere Real Estate/Center-Isle, Inc., 197 Wn. App. 875, 884, 391 P.3d 582 (2017) (because de novo review is based on the complaint and hypothetical facts, findings of fact by the trial court are superfluous).

Moreover, Funko mischaracterizes the Investors' argument. The Investors do not now contend that Funko failed to disclose its reliance on third-party licensors, but that the reported value of its intellectual property licenses was undermined by the amount of dead stock in its warehouses. If these allegations are true, the reported value of Funko's intellectual property was overstated and materially misleading.

Funko also argues that the valuation of its intellectual property is nonactionable statement of opinion. But as with the statements about the value of its inventory, the Investors have satisfied the <u>Omnicare</u> standard by alleging facts demonstrating that the company knew its purported opinion was not factually supportable because that valuation was based in part on the amount of unsaleable stock in its inventory.

<u>Adequacy of Risk Disclosures</u>

Lastly, the Investors contend the trial court erred in concluding, as a matter of law, that Funko's disclosure of "Risk Factors" was neither false nor misleading. The Investors allege that a number of risks Funko identified as events that "could occur," had already come to fruition. They allege:

> The Registration Statement contained pages and pages of numerous generalized possible "Risk Factors" that might occur and "[in] case" they did actually occur, then Funko's financial condition and results of operation "<u>could</u> be materially and adversely affected." Those statements were false or misleading and omitted material information. For example, the Registration Statement listed a host of factors and stated "[i]f demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard." . . . . What the Registration Statement described as future possibilities had <u>already</u> occurred.

They allege that this disclosure violated Item 503 of SEC's Regulation S-K, former 17 C.F.R. § 229.503,[16] by not describing one of the most significant factors making Funko's stock risky.

Funko's registration statement included the mandatory "Risk Factors" discussion. The Investors point to the section entitled "Our success depends, in part, on our ability to successfully manage our inventories." In this section, Funko stated:

> We must maintain sufficient inventory to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin. We obtain substantially all of our inventory from third-party manufacturers located outside the United States and must typically order products well in advance of the time these products will be offered for sale to our customers. As a result, it may be difficult to respond to changes in consumer preferences and market conditions, which for pop culture products can change rapidly. If we do not accurately anticipate the popularity of certain products, then we may not have sufficient inventory to meet demand. Alternatively, if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

The Investors allege that this statement is materially misleading because "the Company's inventory problems had already arrived, born of channel stuffing and Funko's poor internal controls over inventories," leading to the improper postponement of write-downs on obsolete inventory.

The Investors also point to the section entitled "Failure to successfully operate our information systems and implement new technology effectively could

---

[16] Now codified as 17 CFR § 229.105. This regulation requires securities registrants to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky."

disrupt our business or reduce our sales or profitability."  In this section, Funko stated:

> We rely extensively on various information technology systems and software applications to manage many aspects of our business, including . . . management of our supply chain [and] sale and delivery of our products. . . .
>
> In addition, we have recently implemented, and expect to continue to invest in and implement, modifications and upgrades to our information technology systems and procedures to support our growth and the development of our e-commerce business.  These modifications and upgrades could require substantial investment, and may not improve our profitability at a level that outweighs their costs, or at all.

The Investors allege this statement was misleading or omitted material facts because "Funko's business had already been harmed by the failure of a new ecommerce platform and a recent past implementation failure."

As the Investors argue persuasively, risk disclosures that describe factors that could occur in the future are misleading if they fail to disclose that the risk has already transpired.  "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."  Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004).  And perhaps even more persuasive is Ferreira v. Funko, Inc., 2021 WL 880400 (C.D. Cal. 2021), in which a federal court examined Funko's statement in a 2019 SEC filing that, like its registration statement, identified as a risk factor that its "success depends, in part, on [its] ability to successfully manage [its] inventories."  Id. at *16.  The plaintiffs in Ferreira, as the Investors here, alleged that this statement was misleading because Funko knew that the risk of excess inventory had already materialized.  Id. at *17.  The

court concluded that the plaintiffs had adequately pleaded facts to support the allegation that the risk disclosure was misleading:

> While the Court agrees with the Funko Defendants that the risk disclosure only discussed possible future risks and did not affirmatively state Funko had no excess or obsolete inventory, the disclosure is misleading and not meaningful because it sets forth various hypothetical risks associated with maintaining excess inventory without disclosing that this risk had materialized, as alleged by Plaintiffs. This is exactly the circumstance under which the Ninth Circuit has found this type of statement to be misleading.

Id. at *18. See also Siracusano v. Matrixx Initiatives, Inc., 585 F.3d 1167, 1181 (9th Cir. 2009) (company made material misrepresentations where it disclosed the risks of possible product liability lawsuits without disclosing that a product liability lawsuit had already been filed).

Funko argues that dismissal of this claim was appropriate under the "bespeaks caution" doctrine. Dismissal on the pleadings under this doctrine is appropriate only where "the documents containing defendants' challenged statements include enough cautionary language or risk disclosure that reasonable minds could not disagree that the challenged statements were not misleading." Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir. 1995) (citations and quotations omitted), cert. denied, 517 U.S. 1136 (1996). To meet this standard, the language bespeaking caution must relate directly to the language which plaintiffs claim to be misleading. In re Atossa Genetics Inc. Sec. Litig., 868 F.3d 784, 798 (9th Cir. 2017).

Funko did caution potential investors that "if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard."

But Funko's risk disclosures did not directly address the issue of which the Investors now complain: that its collection of unsaleable stock had already negatively impacted the value of its inventory, the value of which was thus overstated in the consolidated balance sheets. In light of these factual allegations, reasonable minds could disagree on the sufficiency of this cautionary language and thus the bespeaks caution doctrine does not warrant dismissal at the CR 12(b)(6) stage.

We therefore conclude that, under CR 12(b)(6), the Investors adequately allege material omissions in the registration statement's risk disclosures. The trial court erred in concluding otherwise.[17]

Section 15 Claims

Section 15 provides investors with a private cause of action against anyone who "controls" a party found liable under Section 11 or 12:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock

---

[17] Funko argues that the trial court's finding that the Gandel article was not a "corrective disclosure" provides an independent basis for dismissing the Investors' claims regarding its financial disclosures. We reject this argument. To recover for securities fraud under Section 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b), a plaintiff must establish "loss causation," i.e., a causal connection between a material misrepresentation and the plaintiff's loss. In re Iso Ray, Inc. Sec. Litig., 189 F. Supp. 3d 1057, 1079 (E. D. Wash. 2016). One method of proving loss causation is by showing that a corrective disclosure, or a disclosure that reveals the fraud, caused the stock to decline. Id. But under Section 11, damages are measured by the difference between the amount paid for a security and its price either at the time it was sold or the date the Section 11 claim was filed. 15 U.S.C. §77k(e). Loss causation is thus not an element of a Section 11 claim, but can be used as an affirmative defense if the defendant can prove that the depreciation in value of its security resulted from factors other than the alleged material misstatements or omissions in the registration statement. In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1421-22 (9th Cir. 1994). Because the Investors here allege claims under Section 11 of the Securities Act of 1933, and not Section 10(b) of the Securities Act of 1934, they do not have to show that the stock price drop occurred as a result of a corrective disclosure. The trial court's finding that the Gandel article did not disclose any fraud and merely disclosed an analysis of Funko's financial condition based on disclosures in the registration statement does not require a dismissal of the Investors' claims, as Funko has not established this affirmative defense as a matter of law.

ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77*o*(a).

In order to state a prima facie case under Section 15, a plaintiff must allege: "(1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator." No. 84 Emp'r–Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 945 (9th Cir. 2003) (quoting Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000)) (quotation marks omitted). Because the Investors adequately allege primary violations of Sections 11 and 12(a) of the Securities Act, the Investors adequately pleaded the first prong of their Section 15 claim.

As to the control prong, the Investors allege that each of the individual defendants were control persons of Funko by virtue of their positions as directors or senior officers of Funko's predecessor, FAH LLC. The Investors also allege that the Venture Capital Firms were control persons of Funko and FAH by virtue of their ownership of Funko securities, board membership, relationships with management, and contractual rights regarding Funko's governance.

Fundamental Capital LLC and Fundamental Capital Partners, LLC moved to dismiss the Investors' Section 15 claim on the ground that, as a minority shareholder, they could not be a "control person" as a matter of law under the Securities Act. The trial court granted their motion without specifying whether the

dismissal was based on the primary violation prong or the control prong of the Section 15 test. Fundamental Capital argues that the Investors have abandoned their "control person" argument by failing to raise it on appeal. We decline to conclude that the Investors abandoned a legal argument when there is no clear indication in the record that the trial court ruled against them on this ground.

Fundamental Capital contended below that the Investors failed to allege facts to support the contention that they had the power to direct Funko's management policies or day-to-day activities or had the ability to control the content of the registration statement. We disagree. The Investors allege that Fundamental Capital owned 34.9% of the Funko Class A common stock and 27.7% of the Funko Class B common stock as of the IPO. They also allege that Fundamental Capital was a part of a group that, with a representative from ACON and the chief executive officer, remained on Funko's board after the IPO. The Investors further allege that Fundamental Capital was a member of FAH and through that membership had the ability to control the board, the power to cause the registration of the stock sold in the IPO, and through their representative on the board, signed the registration statement, affirming the statements the Investors now claim to be false or misleading.

The SEC defines control as, "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. The determination of who is a control person is "an intensely factual question." Arthur Children's Tr. v. Keim, 994 F.2d 1390, 1396 (9th Cir.

1993).  We cannot say, at this stage of the pleadings, that it appears beyond doubt that the Investors can prove no set of facts which would entitle them to relief against Fundamental Capital under Section 15.  For this reason, we reverse the dismissal of the Investors' Section 15 claim against both Venture Capital Firms.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

Andrus, A.C.J.

WE CONCUR:

Brunner, J.

Appelwick, J.